Carroll M. Roberts, J.
This is an action by the plaintiff to compel the defendant to specifically perform an agreement on the part of the defendant to reconvey to the plaintiff a manufacturing plant in the city of Auburn, New York. There is no dispute as to the material facts.
Prior to July, 1950 the International Harvester Company, which formerly owned and operated a factory in the city of *628 Auburn, New York, terminated its manufacturing operations in that city. The loss of this industry was accompanied by loss of employment to the residents of that city. On July 17, 1950 plaintiff was incorporated as a membership corporation to acquire and transfer real and personal property “ for the purpose of promoting and fostering the Industrial Development of the City of Auburn, New York”. The International Harvester Company conveyed to plaintiff on the date of its incorporation its manufacturing plant in the city of Auburn for the purpose of creating employment for its former employees.
The defendant at that time was a manufacturing corporation with plants in various parts of the country engaged in the manufacture of laundry equipment, filtration equipment, oil separation equipment, components of airplanes, and other civilian products, and it was then negotiating with the Government for contracts to manufacture shells. It was desirous of obtaining additional manufacturing facilities and learned of the availability of the former International Harvester plant at Auburn. Following inspections of the plant and preliminary negotiations, it entered into a contract with the plaintiff on February 1, 1951 for acquiring a portion of said plant.
This contract provided for the conveyance of the premises to the defendant and for various matters preliminary to and connected with said conveyance. There was no provision for any payment by the defendant for this property. In addition the contract contained certain provisions which by their very terms were to survive the delivery of the deed. These related to the use and maintenance of the premises, an agreement by the defendant not to convey or sublet for five years except under certain conditions, an agreement to reconvey the premises at the option of the plaintiff if industrial operations and employment as contemplated were not continued for five years from the date of the deed, and a further agreement that if such industrial operations were discontinued defendant might remove its fixtures, machinery and equipment, and in the event of the surrender of the property to the plaintiff, the cost of permanent improvements made by the defendant to the buildings would not be charged to the plaintiff.
The covenant of the defendant to reconvey said premises, which is the basis of this lawsuit, was contained in paragraph 9 of the contract and provided as follows: “ 9. It is mutually understood and agreed that in the event the party of the second part, within a period of five years from the date of the deed conveying the property above mentioned to the party *629 of the second part, should discontinue its industrial operations and employment of labor as contemplated, excepting, however, fluctuations of industrial operations and employment of labor arising from economic conditions, transition from civilian to war production, or from war to civilian production, disasters, acts of God and the like, that the party of the second part shall, at the option of the party of the first part, reconvey said premises to the party of the first part.”
After the preliminary steps required by the contract had been completed the plaintiff delivered a deed to the defendant on May 5, 1952. The only consideration which defendant paid for the property was the sum of $1 together with its undertakings contained in said contract which by their terms were to survive the delivery of the deed. The plaintiff, being a membership corporation, had to obtain the consent of the court before making the transfer. The resolution of plaintiff’s board of directors, its petition to the Supreme Court, and the order authorizing the sale of the property, all recited that the consideration for the conveyance was the sum of $1 together with the agreement on the part of the defendant to conduct a general manufacturing and industrial business and employ such labor as should be required in connection therewith. The deed itself recited that the consideration was the sum of $1 and other good and valuable consideration as provided for in the order authorizing the sale.
It is the claim of the plaintiff that during the month of March, 1956 the defendant discontinued its industrial operations and employment of labor as contemplated by said contract and that the plaintiff thereupon exercised its option to require the reconveyance to it of said premises and that the defendant declined to reconvey. This action is to compel the defendant to specifically perform its agreement to reconvey.
It is the first contention of the defendant that the contract of February 1, 1951 merged in the deed subsequently delivered and that by reason of such merger the provisions relating to reconveyance of the premises became inoperative. This claim of merger is pleaded in the first five affirmative defenses in defendant’s original answer.
After issue was joined, defendant moved under rules 106 and 113 of the Rules of Civil Practice to dismiss the complaint and for summary judgment on the ground of merger. This motion was denied by Mr. Justice Gorman at Special Term, who held that merger was a question of intention and the issue of intention must be determined upon evidence presented at the trial at which time evidence could also be *630 offered to establish the actual consideration involved. This decision was unanimously affirmed on appeal. (Industrial Development Foundation of Auburn, N. Y. v. United States Hoffman Mach. Corp., 3 AD 2d 983, motion for leave to appeal denied 4 A D 2d 846.)
Where a contract to convey is followed by a deed, only those provisions of the contract are deemed to be merged in the deed which relate to the conveyance itself; other provisions in the contract remain in force and there is no presumption of merger as to such provisions. (Schoonmaker v. Hoyt, 148 N. Y. 425; Disbrow v. Harris, 122 N. Y. 362; Morris v. Whitcher, 20 N. Y. 41; Siebros Finance Corp. v. Kirman, 232 App. Div. 375; Brunswick Constr. Co. v. Burden, 116 App. Div. 468, 472; Kilbane v. Scarsdale Downs Homes, 132 N. Y. S. 2d 234.)
In Siebros Finance Corp. v. Kirman (supra), a contract for the conveyance of real property contained an option giving the vendee the right to resell the property to the vendor after a certain date. In discussing the defense of merger the court there said (p. 377): “ The contract clearly shows that there was no intention on the part of the parties to merge the contract in the deed. A contract for the sale of real estate is merged in the deed only when the latter is intended to be accepted in full performance of the former. This intention may be derived from the instruments alone or from the instruments and the surrounding circumstances. Collateral undertakings not a part of the main purpose of the transaction, that is, the conveyance of real estate, by their very nature may show an intent that they should not be merged in the deed and, therefore, are not extinguished by the acceptance of the deed. (Lambert v. Krum, 121 Misc. 170.) ”
In the contract here under consideration, the agreement on the part of the defendant to reconvey the premises in the event of the breach of the condition subsequent was a continuing obligation for a period of five years from the date of the deed to said defendant. This covenant was entirely independent of the provisions of the contract relating to the original conveyance to the defendant. It imposed a collateral and continuing duty upon the defendant for a period of five years after the delivery of the deed. Thus, the contract itself by its very terms showed there was no intention that such provisions should merge in the deed.
When the deed was given, the only actual consideration which passed, aside from the nominal sum of $1, consisted of those covenants on the part of the defendant contained in the contract of February 1, 1951, which by their very terms *631 ¡survived the delivery of the deed. These covenants, being part of the consideration, did not merge in the deed. (Sage v. Truslow, 88 N. Y. 240.)
Defendant claims that a contrary intention is indicated as the result of certain correspondence between the parties relating to a facilities contract entered into between the defendant and the Government as of February 16, 1951. By this contract the Government agreed to furnish or reimburse the defendant for furnishing machinery and equipment described as “ facilities ” at the Auburn plant. The contract provided that title to these facilities was to vest in the Government and when they were no longer required for the performance of the contracts for which they were authorized that they were to remain in stand-by condition for 90 days. Such stand-by condition meant, according to the contract, that they were to be retained in defendant’s plant or stored elsewhere so that they could be readily installed if production was resumed. This contract further provided that after the 90-day period the defendant would store such facilities at its plant for an additional period of six months provided such storage would not materially impair the use of the plant for Government or commercial work.
On June 28, 1951 defendant wrote the plaintiff advising it of the provisions of this Government contract and suggesting that plaintiff should not have the right to exercise its option for a reconveyance of the property during the storage period if the Government should require such storage. In its reply of July 6, 1951 plaintiff suggested that no immediate change be made in paragraph 9 of its contract with the defendant but that when a deed was given a mutually agreeable clause covering the matter could be inserted in the deed.
Defendant claims that because nothing was later inserted in the deed it indicated that the parties then intended a merger. There is nothing in the correspondence to indicate any intent to abandon the provisions of the 9th paragraph of the contract, and the more logical inference to be drawn is that the parties by inserting no modification of the paragraph in the deed intended to retain the provisions of the contract as originally drawn.
The court finds from the terms of the contract itself, from the fact that the covenants therein contained constituted the consideration for the deed, and from the situation Of the parties and the objects they had in mind, that their intention w'as that the contract of February 1, 1951 did not merge in the deed of May 5, 1952.
*632 Subsequent to the original deed, various quitclaim deeds from the individual members of the plaintiff, and also a correction deed from the plaintiff, were given to the defendant. The correction deed was given pursuant to an order of the court which set forth that the conveyance was for the purpose of correcting errors in the description as contained in the prior conveyance. Obviously the quitclaim and correction deeds were given solely for the purpose of perfecting defendant’s title and showed no intention on the part of the plaintiff to release defendant from its obligations under the original contract which by their terms survived the delivery of the deed.
Certain additional defenses are urged by the defendant under the issues raised both by the original and a supplemental answer.
It is the second contention of the defendant that even though there was no merger defendant has never discontinued its operations. The contract did not specify the discontinuance of all operations. It specified the discontinuance of “industrial operations and employment of labor as contemplated ’ ’.
This requires a preliminary examination of the contract to determine what industrial operations and employment of labor were contemplated or intended by the parties.
Paragraphs 12 and 15 of the contract clearly indicate the nature of the industrial operations which were contemplated. Paragraph 12 provides that the defendant will conduct on the premises a general manufacturing and industrial business and that it will not utilize the same for general storage purposes except as necessary for general manufacturing operations. By paragraph 15 it is agreed ‘ ‘ that it is the intention of the party of the second part to use said above described buildings and property for a time after being acquired under the terms of this agreement for the production and manufacture of war materials, hut after said production ceases that the property will then he used hy the party of the second part for the manufacture and production of civilian commodities(Emphasis supplied.) Under the exceptions in paragraph 9 of the contract it was further provided in substance that the period of transition from war to civilian production would not be deemed a discontinuance of industrial operations. It is true that paragraph 15 did not contain a specific covenant on the part of defendant to convert to civilian production but it was an express and definite statement that such conversion was intended as part of the manufacturing operations which were contemplated; otherwise paragraph 15 was meaningless.
*633 The employment of labor which was contemplated and intended by the parties appears from the preliminary recitals of the contract wherein it is stated that plaintiff is desirous of making arrangements for the occupancy of the property by manufacturing concerns “ in order to supply employment to the citizens of the City of Auburn and its surrounding territory, and in order to gain for the community the other advantages incident to the act of operation of such premises for commercial purposes ”, and wherein it is stated that defendant in order to carry out its manufacturing program 1 ‘ will be employing in such operations, as soon as possible, approximately 400 employees ’ ’. It is further stated that the arrangements outlined in the contract “ will be to the mutual advantage of both parties, and to the people of the City of Auburn, New York”. Such recitals, while not strictly forming a part of the contract, may be resorted to as indicating the intention of the parties and the meaning and scope of the agreement. (Maloney v. Iroquois Brewing Co., 173 N. Y. 303, 307; Bintz v. City of Hornell, 268 App. Div. 742, 747, affd. 295 N. Y. 628; Matter of Schwimmer, 8 Misc 2d 550, 553.)
It is apparent, therefore, from the contract itself, and the court finds, that it was the intention of the parties, as expressed in said contract, that the industrial operations referred to in paragraph 9 were to consist temporarily of the manufacture of war materials, and that after such production ceased, the continuity of industrial operations was to be maintained by the defendant by going into the production of civilian commodities, except for the period reasonably necessary to convert from war to civilian production and that the employment of labor contemplated in such manufacturing operations whether of war materials or civilian commodities was that of approximately 400 persons.
Aside from the contract itself, there is further evidence that the defendant intended a continuity of manufacturing operations by converting from war to civilian production after war production ceased. When defendant wrote to the plaintiff on June 28, 1951 with reference to the provisions of the facilities contract relating to the storage of machinery after war production ceased, it said: “ Furthermore, the reconversion of the plant to commercial operations would no doubt require approximately the same time as the maximum time which the Government would require us to store their facilities, and this period could be used for the reconversion of the plant.”
The next question presented for determination is whether the defendant during the five-year period which expired on *634 May 4, 1957, discontinued its industrial operations and employment of labor as so contemplated and hence breached the condition which entitled the plaintiff at its option to enforce defendant’s covenant to reconvey.
As of February 16, 1951 the defendant entered into two contracts with the Government, one of which was the facilities contract to which reference has already been made, and the other a contract for the manufacture of three types of 155 MM shells, which was referred to in the testimony as a supply contract. Production was started and by February 10, 1952 employment reached the 400 mark and thereafter increased until it passed the 1,000 mark in June, 1952 and reached a maximum of over 1,400 in October, 1952. Thereafter employment remained between 1,200 and 1,400 until June, 1954 when it abruptly dropped to approximately 400. It remained at about this level until February, 1956 when it again began to decline until by April 1, 1956 there were only 46 employees. From that time until the expiration of the five-year period on May 4, 1957 it fluctuated from a minimum of 22 to a maximum of 59. The fact that defendant employed more persons than contemplated for the period between February, 1952 and June, 1954 did not relieve it from its obligation to provide a continuity of operations and employment for the full five-year period as required by paragraph 9 of the contract.
The drop in employment at the end of May, 1954 was due to the fact that the Government at that time discontinued production under the supply contract of one type of 155 MM shells, production of the other two types continuing until March of 1956. In that month all production of war materials at the Auburn plant ceased and there were no further manufacturing operations conducted by the defendant at this plant up to the end of the five-year period on May 4, 1957. In other words, during a period of more than one year before the expiration of the five-year period, there were no manufacturing operations whatever and the number of employees, instead of the approximate 400 contemplated, were at all times less than 60.
The defendant concedes that after the production of war materials ceased in March, 1956 it made no attempt to convert to civilian production, has made no attempt since, and has no plans for any such conversion.
In 1957 the defendant did obtain two additional Government contracts, one on February 14 and the other on June 27. In the middle of the summer of that year some production was started under the first contract and test runs were made under the second. During a period of eight weeks from 100 *635 to 200 persons were employed. However, both of these contracts were cancelled by the Government on August 13, 1957 and there has been no further production or manufacturing* operations at the Auburn plant where at present 26 employees are carried on defendant’s payroll.
Defendant maintains that it did not discontinue industrial operations in March, 1956 because subsequent to that date it was maintaining its Auburn plant in a stand-by position pursuant to the terms of a fixed price storage contract it made with the Government on December 29, 1954.
By this contract the defendant agreed during the period from November 1, 1954 through January 31, 1955, and thereafter on a month to month basis at the option of the Government, to maintain the Government-owned facilities at its Auburn plant “in standby in their present operational position under power ”, for which the Government agreed to pay the defendant the sum of $33,000 per month.
The fixed price storage contract of December 29, 1954 in article 4 thereof contemplated the future execution of a so-called “layaway contract” which would terminate the fixed price storage contract. Defendant introduced a letter under date of January 31, 1958 from the contracting officer of the Rochester Ordnance District to the defendant, stating that funds were now available for the layaway of the balance of equipment at defendant’s plant and that the dismantling, cleaning and preserving of said equipment would be started immediately. It does not appear whether the Government equipment after being so dismantled would be stored at the defendant’s plant or elsewhere.
It further appears that the defendant cannot now obtain any new Government contracts in the absence of some form of stand-by agreement.
There was nothing in defendant’s earlier supply contract or facilities contract that obligated it to enter into the fixed price storage contract. Defendant entered into this contract voluntarily and with full knowledge of its obligation to the plaintiff. In contemplating the approaching end of war production, the fixed price storage contract of December 29, 1954 may then have appeared more attractive to the defendant than the conversion *to civilian production. It produced for the defendant a substantial income and required no riianufacturing operations, no production, and only a minimal payroll. Even though the maintenance of the Government-owned machinery in standby under this contract could not be considered general storage as prohibited in paragraph 12 of the *636 contract, it did not constitute industrial operations or employment of labor as contemplated by the parties in paragraph 9 of the contract. That contract must be construed and the intention of the parties determined as of the date it was made. At that time the defendant had no Government contracts for the Auburn plant and there is no proof that the provisions of any contemplated contracts were brought to plaintiff’s attention. In fact the only Government contract shown to have been brought to plaintiff’s attention was the facilities contract of February 16, 1951 which contained a standby provision of only 90 days. The fixed price storage contract was made more than three and a half years after the contract between the plaintiff and defendant, and even after it was made the terms thereof were never brought to plaintiff’s attention and it is in no way binding upon the plaintiff.
The court finds that industrial operations and the employment of labor at the Auburn plant as contemplated and intended by the parties under their contract of February 1, 1951 ceased and were discontinued in March, 1956 and have never since been resumed.
Promptly after the discontinuance of such operations and on March 23, 1956 the plaintiff wrote the defendant, calling its attention to the discontinuance of industrial operations and stating that the time had come for a reconveyance of the property pursuant to the terms of the contract. The matter was therefore called to the attention of the defendant more than a year before the expiration of the five-year period on May 4, 1957. Yet the defendant, instead of converting to civilian production and hence continuing its manufacturing operations as contemplated, replied to the letter under date of April 2, 1956, taldng the position that reconveyance of the property was not required on the ground that the contract had merged in the deed and upon the further ground that the then existing circumstances came within the exceptions contained in paragraph 9 of the contract.
It is the defendant’s third contention that even though its manufacturing operations ceased in March, 1956, such cessation of operations was due to economic conditions and hence is within one of the exceptions contained in paragraph 9 of the contract.
The production of war materials ceased because the Government no longer needed large quantities of 155 MM shells. This was not due to economic conditions but to the cessation of hostilities in Korea. The parties, when they made their contract, contemplated such a situation and provided that when *637 it occurred the defendant would convert to civilian production. There is no proof or suggestion here that the failure of the defendant to make such conversion was in any way due to economic conditions.
The remaining contention of the defendant is that the relief demanded would operate as a forfeiture which is not favored in the law and that equity should deny relief because to grant it would work a great hardship on the defendant and be unconscionable.
It is true that forfeitures are not favored in the law, and where a contract is capable of different constructions, it will be construed strictly in order to avoid such a forfeiture. (Baley v. Homestead Fire Ins. Co., 80 N. Y. 21; Lyon v. Hersey, 103 N. Y. 264.) It is also true that as a general rule equity will not act to enforce a forfeiture. This rule rests, however, upon the same general equitable principles that apply where relief is denied in actions for specific performance. These are (1) that the party seeking relief is not himself doing equity by attempting to gain an unjust advantage through the enforcement of a contract which is unequal or inequitable; in other words, that he does not come before the court with ‘ ‘ clean hands”; (2) that an action at law for damages will provide adequate compensation; or (3) that the relief, if granted, will cause hardship to the defendant disproportionate to the injury caused by the breach. (2 Pomeroy on Equity Jurisprudence [5th ed.], § 459.)
On the other hand, the law permits parties to make a contract which will result in a forfeiture, and where it is clear from the contract that the parties have so agreed, and where the elements prompting the court to deny relief are absent, equity will not hesitate to enforce a forfeiture arising by breach of a condition subsequent. (Kern Riv. Co. v. United States, 257 U. S. 147, 155; Lindeke v. Associates Realty Co., 146 F. 630; Telegraphone Corp. v. Canadian Telegraphone Co., 103 Me. 444, 453-454; 12 Am. Jur., Contracts, p. 1015.)
Here, the contract between the parties is susceptible of only one construction. The covenant of the defendant to reconvey at the option of the plaintiff on breach of the condition is essentially a forfeiture, but the language is clear and unambiguous and states the express intention of the parties.
The hardship which the defendant claims should move the court to deny relief arises largely by reason of the fact that it has expended large sums in permanent improvements of the property. Subsequent to the making of the contract it expended in improvements and additions to the buildings the *638 sum of $479,264.66. Additional expenditures were made primarily for improvements to the land, which have not been itemized or explained, in the sum of $65,420.99.
These improvements were not only contemplated by the parties when the contract was made, but it was also recognized that the hardship imposed by the cost of these improvements must be borne by the defendant in the event it was called upon to reconvey the property to the plaintiff. The contract itself specifically provided that the cost of such permanent improvements should not be charged to the plaintiff in the event of the surrender of the property to it. These improvements were therefore made by the defendant with full knowledge of the possibility that it might be called upon to reconvey to the plaintiff after such expenditures had been made and without reimbursement. Equity will not refuse the relief of specific performance because of difficulties or hardships which were or should have been within the contemplation of the parties when the contract was made. (Froehlich v. K. W. W. Holding Co., 116 Misc. 275, 278, affd. on opinion below 201 App. Div. 855.) Even though the defendant has made substantial expenditures, it has received compensating benefits. It has had the use and ownership of this manufacturing plant, for which it paid only $1 in cash, for the processing of Government contracts aggregating $78,000,000.
A further hardship claimed arises from the fact that the plant is equipped with valuable machinery owned by the Government which is being maintained by the defendant on a stand-by basis. This situation arose by reason of the fixed price storage contract which the defendant made more than three end a half years after its contract with the plaintiff. In an action for specific performance the contract sought to be enforced must be judged as of the time it was entered into and if fair when made, specific performance will not necessarily be refused because of hardships arising by reason of subsequent circumstances or changing events. (Prospect Park & Coney Is. R. R. Co. v. Coney Is. & Brooklyn R. R. Co., 144 N. Y. 152; Hartman v. Day, 248 App. Div. 819; Froehlich r. K. W. W. Holding Co., supra; Sanford v. Smith, 4 Misc 2d 820, 824, affd. 273 App. Div. 928.) This is particularly so in the present ease where the claimed hardship arises by reason of a subsequent contract made by the defendant with full knowledge of its obligations to the plaintiff under the prior existing contract.
There is at present no public interest involved in keeping the property available for the production of war materials. This is indicated by the repeated and unsuccessful efforts of *639 tlie defendant commencing in 1955 to obtain additional Government contracts for the Auburn plant and by the recently announced intention of the Government to dismantle its machinery and preserve the same in layaway.
No grounds other than hardship are claimed as a reason why a court of equity should deny relief. No such grounds exist. The plaintiff has no adequate remedy at law. It has sustained no pecuniary damage by reason of the defendant’s breach and the only relief available to it is the relief of specific performance which it here seeks. The contract itself involves no element of mistake, fraud, sharp practice or overreaching on the part of either the plaintiff or the defendant. It was fairly made. The contract has been fully performed by the plaintiff. The plaintiff is a nonprofit membership corporation. It paid only $1 for the property when it was acquired and received only $1 when it was conveyed to the defendant. Its only objective in the transaction was to promote the public interest of the City of Auburn by supplying employment to the inhabitants of that city. Plaintiff now seeks no corporate or personal gain or advantage through the enforcement of the contract other than to promote this same public purpose. Such a public interest is sufficient to move a court of equity to grant relief by enforcing a forfeiture. (Kern Riv. Co. v. United States, 257 U. S, 147,155, supra.)
The hardships which the defendant now claims are not alone sufficient to deny the plaintiff the relief to which it is otherwise clearly entitled. On the other hand, to deny such relief would unfairly permit the defendant to retain the benefits it received without furnishing the full consideration it agreed to give for such benefits.
At the close of the evidence the defendant moved for dismissal of the complaint and for judgment, upon which motions the court reserved decision. Said motions are now denied with an exception to the defendant,
Let judgment be entered in accordance with this decision requiring the defendant to specifically perform its contract by reconveying to the plaintiff the real property described in the complaint, with costs.