Argued September 2, affirmed November 12, petition for rehearing
denied December 7, 1976

MILLER et al, *Appellants,*
*v.*
MILLER et ux, *Respondents.*

555 P2d 1246

*William D. Cramer,* of Cramer & Pinkerton, Burns, argued the cause for appellants. With him on the briefs was Stephen D. Finlayson, Burns.

*Irvin D. Smith,* Burns, argued the cause and filed a brief for respondents.

Before Denecke, Chief Justice, and McAllister, Holman, and Howell, Justices.

HOLMAN, J.

## HOLMAN, J.

Plaintiffs brought a suit for the specific performance of a contract to sell to plaintiffs shares of stock in a family corporation. They appeal from an adverse decree.

Plaintiffs and Donald Miller[1] are the sons of Clarence (Taft) Miller, who, through the years, accumulated a ranch and six children.[2] About 1960 he incorporated his ranch for the purpose of facilitating gifts of interests in his estate to his children, whereupon 2,150 shares of stock were issued. At various times he made gifts of stock to his children. Plaintiffs, who were then young men, remained on the ranch and collaborated with their father in its operation. Plaintiffs entered into identical agreements with their brother (defendant Donald Miller) and their sisters, whose shares of stock in the corporation were to be purchased by plaintiffs. It was assumed by all that by this means plaintiffs would eventually acquire ownership of the ranch. However, there is no evidence or claim by anyone that Taft Miller had ever agreed to divest himself of a controlling interest in the ranch in consideration of the plaintiffs' remaining and working thereon, and he is not a party to this litigation. The agreement between plaintiffs and defendant Donald Miller is, in part, as follows:

> "WHEREAS, Clarence S. Miller, the father of the seller and of the buyers, *has heretofore made gifts to the seller of 34 shares of capital stock* of Rock Creek Ranch, Inc., an Oregon Corporation, and

> "WHEREAS, the seller desires to sell said shares of stock to the buyers and the buyers desire to purchase the same, and

> "WHEREAS, *the seller expects to receive similar future gifts of said stock which he likewise desires to sell*

---

[1]Defendant Janet Miller is the wife of defendant Donald Miller.

[2]By the time of trial one child had died, leaving heirs.

to the buyers and the buyers desire to purchase the same, it is hereby agreed between the parties hereto as follows:

"I.

"The seller does hereby promise and agree to sell and the buyers do hereby promise and agree to buy the above mentioned 34 shares of capital stock of said corporation at the market value thereof, the sum of $175.

"* * * * *.

"WHEREAS, *it is contemplated that additional shares of stock in said corporation shall either be (1) given to the seller over the years by the parent, Clarence S. Miller, or inherited by the seller from said parent or obtained by both gift and inheritance, and, whereas, the seller desires to herein obligate himself to likewise sell said shares of stock to the buyers and it is the desire of the buyers to likewise purchase any such additional shares of stock obtained either by gift or inheritance,* it is hereby agreed as follows:

"A. The seller does hereby promise and agree to sell to the buyers and the buyers do hereby promise and agree to purchase from the seller, *any and all shares of stock of Rock Creek Ranch, Inc. that the seller may hereafter become the owner of* and the sale and purchase price is hereby fixed at the market value of each such share of stock at the date that the seller shall become the owner thereof. * * *.

"* * * * *." (Emphasis ours.)

Some ten to twelve years went by during which plaintiffs gradually took over the operation of the ranch. At the same time they accumulated control of 1,002 shares of stock either by direct gifts from their father or as the result of his gifts to their brother and sisters which plaintiffs acquired under their agreements. Misunderstandings and friction then developed between plaintiffs and their father as well as between the two plaintiffs themselves, and the father came to the conclusion that he should keep control of the ranch and not make any more gifts. Upon hearing this, one of the plaintiffs left the ranch in June of 1972.

The other plaintiff remained on the ranch until January or February of 1973, during which time he

[ 642 ]

entered into negotiations with his father and defendant Donald Miller concerning the purchase of a controlling interest by himself and Donald Miller. These negotiations were fruitless. This plaintiff also left when his father informed him that he was entering into some sort of a transaction solely with Donald Miller. There is no evidence that Donald Miller interfered with the relations between plaintiffs and their father or that he instigated or caused the father to change his mind and to come to the conclusion that he should, by terminating his gifts to his children, prevent plaintiffs from acquiring control of the ranch through their agreements with their brother and sisters.

The agreement between the father and Donald Miller was made on February 16, 1973, and purported to grant an option to Donald to acquire the father's remaining 1,148 shares of stock in the corporation. The option was to run for ten years, during which time the optionee was to pay not less than $500 a year to keep the option in effect. If the option was not exercised such payments were forfeited. The agreement provided that the option was to be exercised by a notice sent to the father by certified mail. The purchase price was $432,000 and, upon exercise of the option, payments were due in the sum of not less than $20,000 per year, payable by December 15 of each year. Interest upon the unpaid balance would accrue at 4 per cent upon the exercise of the option. At the time of the litigation Donald Miller had paid his father one $6,705 payment, which represented a debt the father had incurred by way of income taxes, and two $20,000 payments: one immediately prior to December 15, 1973, and the other prior to December 15, 1974. However, the option was not purported to have been exercised because of the lack of the requisite notice.

As part of the same transaction, the father gave to Donald what appears on its face to be a revocable proxy to vote the 1,148 shares of stock. Donald has since occupied, operated and controlled the ranch and, while no dividends have been declared, he has paid

[ 643 ]

himself and his wife salaries of approximately $30,000 out of ranch revenues. Had any dividends been declared, those dividends payable on the shares which were the subject of the option and the proxy would have gone to the father but would have been credited on the purchase price when the option was exercised.

Plaintiffs contend that (1) the purported option was not an option but a sale and that, even if it was only an option, it has been exercised; and (2) defendants, under Donald's agreement with plaintiffs, are required to sell their acquired interest in the stock to plaintiffs. Defendants, on the other hand, contend that Donald Miller has no present interest in the stock because the option has not been exercised and that even if he is shown to have a present interest, such interest was not acquired by gift or inheritance and therefore is not subject to sale under the agreement. The trial judge did not construe the agreement between plaintiffs and their brother Donald but disposed of the case by determining that the purported option was, in fact, an option; that the option had not been exercised because the written notice required by the agreement was never given; and that Donald therefore had no interest in the stock which was capable of being transferred to plaintiffs.

Although the trial judge disposed of the matter by deciding that the option had never been exercised, we choose to decide the ultimate issue, which has been fully briefed and argued, *i.e.,* whether the agreement between plaintiffs and Donald requires Donald to sell to plaintiffs any shares which he has acquired or might acquire by purchase under his agreement with his father.

Plaintiffs argue that the inclusive operative clause of the corporation stock sale and purchase agreement should be enforced despite the narrow recital immediately preceding it. Their argument is based on a rule of English origin for the interpretation of deeds:

"Now there are three rules applicable to the construc-

[ 644 ]

tion of such an instrument. If the recitals are clear and the operative part is ambiguous, the recitals govern the construction. If the recitals are ambiguous, and the operative part is clear, the operative part must prevail. If both the recitals and the operative part are clear, but they are inconsistent with each other, the operative part is to be preferred."

*Ex parte* Dawes, 17 Q.B.D. 275, 286 (1886). This rule has been adopted by most American courts and has been applied to contracts as well as to deeds. *Williams v. Barkley,* 165 NY 48, 58 NE 765, 767 (1900). 17A C.J.S. *Contracts* § 314 (1963). 17 Am Jur 2d *Contracts* § 268 (1964). The rule has been neither adopted nor rejected in Oregon, but the statement of the rule in *Williams v. Barkley, supra,* was quoted in *Hulin v. Veatch,* 148 Or 119, 133-34, 35 P2d 253, 94 ALR 1319 (1934), in support of the proposition that recitals in a mortgage do not have the force of contractual stipulations. It is also usually held that the inconsistent statement in the recitals may not be used to create an ambiguity as to the operative part of the agreement.

On the other hand, a few jurisdictions have refused to apply the rule but hold that the entire agreement, recitals included, should be considered in determining the intent of the parties. If this holding is followed, a patent ambiguity exists in the present case as to the intent of the parties. *Scott v. Albemarle Horse Show Ass'n.,* 128 Va 517, 104 SE 842, 845-46 (1920) acknowledged the ordinary rule of construction but nevertheless relied on recitals in determining intent. A similar holding was reached in *Thomson Electric Welding Co. v. Peerless Wire Fence Co.,* 190 Mich 496, 157 NW 67, 70 (1916), which said:

"In construing written agreements the actual undertaking of the parties is to be deduced from the entire instrument, taking into consideration, reconciling, and giving meaning to all its parts so far as possible, including recitals as well as operative clauses, and, when so considered, language which has a distinct meaning standing alone may, in the connection used, become

doubtful or its meaning modified by other parts of the instrument, including particular recitals."

In *Downing v. Independent School Dist. No. 9,* 207 Minn 292, 291 NW 613, 616 (1940), it was said that in the construction of written agreements the intention of the parties is to be deduced from the entire instrument. The court used the following language:

"The 'cardinal rule' in the interpretation of contracts (and this applies to statutes, ordinances, and the like) 'is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles.' 12 Am. Jur., Contracts, § 227. The rules of interpretation 'are not inflexible, their purpose being to reach the probable intent of the parties.' * * *."

*Also see* the opinion by Cardozo, J., in *Wood v. Lucy, Lady Duff-Gordon,* 222 NY 88, 118 NE 214 (1917), which used recitals in establishing a mutuality of obligations and thus a binding contract. More recently, in *Employer's Liability Assurance Corporation v. Lunt,* 82 Ariz 320, 313 P2d 393, 398 (1957), the Arizona Supreme Court said as follows:

"Appellees rely on the holding in *Jamison v. Franklin Life Insurance Co.,* 60 Ariz 308, 136 P2d 265, to the effect that if both the recital and the operative clause are clear but inconsistent with each other, the operative part is to be preferred. We recognize the Jamison case as the law; however, we point out that the rule stated therein is but an arbitrary device adopted of necessity where the intention of the parties cannot otherwise be fairly determined. * * * Where the intention can be determined from the entire instrument, the contract is to be construed as a whole. * * *."

That case was followed by *Bowen v. Sil-Flo Corporation,* 9 Ariz App 268, 451 P2d 626, 635 (1969), which stated:

"* * * A recital is a part of a contract which should be considered in determining the intent of the parties as expressed in the entire document, and on occasion a recital may be a most important indication of the parties' intent. [Citations omitted]."

[ 646 ]

A slightly different position has been taken by a New York court:

> "* * * Such recitals, while not strictly forming a part of the contract, may be resorted to as indicating the intention of the parties and the meaning and scope of the agreement. [Citations omitted]." *Industrial Dev. Found. v. United States Hoff. M. Corp.,* 11 Misc 2d 625, 171 NYS 2d 562, 570 (1958), *aff'd mem.,* 8 App Div 2d 579, 183 NYS 2d 1011 (1959).

■■ The overriding rule in the construction of contracts is that the intention of the parties prevails. The refusal to give any weight to the recital if the operative provisions are "clear" is nonsense, because it ignores the doubt which a conflict between the two may raise as to whether the operative provisions accurately report the intention of the parties. The blind following of the rule asserted by plaintiffs is a catechetical method of construing contracts which, depending upon the circumstances, may or may not have something to do with what the parties intended. The recitals must necessarily concern the contract in some manner; otherwise, there would be no object in including them. If, in the particular fact context, the recitals appear to be inconsistent with the operative clauses, as a matter of common sense there is an ambiguity or question about the intent of the parties, and evidence of the circumstances under which the contract was made should therefore be admitted as an aid in determining the parties' assumed or actual intent.[3] Language consists of words which are mere symbols of ideas. Consequently, any ascertainment of the meaning of language in an agreement requires consideration of the atmosphere in which it originated. By this process the language is made more understandable and is less likely to be misconstrued. It is capable of clear meaning only when read in the light of the circumstances of its employment.

■■ Rules of construction such as the one for which plaintiffs contend are not given the status of positive

---

[3] ORS 42.220.

or substantive rules of law. *deNeergaard v. Dillingham,* 123 Vt 327, 187 A2d 494, 498 (1963). They are aids which experience indicates will most likely bring about the intent of the parties in the absence of an ability to determine that intent with some likelihood by means of other evidence. The rule of construction which plaintiffs put forth here should be applied only in circumstances where the intent of the parties cannot be determined with a fair degree of likelihood when the language is considered in the light of the situation in which it was used.[4]

■ At the time of the agreement plaintiffs had an amicable relationship with their father and with each other and were working with their father in the operation of the ranch. It was apparently contemplated by the entire family that this amicable relationship would continue and that the father would make available to plaintiffs the ownership of the ranch through stock either given or bequeathed to all of his children and thereafter acquired by plainitffs in accordance with the agreements between plaintiffs and their brother and sisters. It was not contemplated by anyone that plaintiffs would have a falling out with their father and with each other, or that the father would change his mind about allowing plaintiffs to acquire a controlling interest and would desire to sell to someone else so that plaintiffs could not acquire such an interest by the contemplated means.

The contract was obviously made with the father's plan to distribute his estate in mind and, in our opinion, was not meant to be applied to situations which were not the result of the intended distribution. Had these subsequent circumstances been anticipated at the time of the agreement, we believe that plaintiffs could not have reasonably contemplated that Donald was obligating himself to sell to them stock which he did not acquire by gift or inheritance but could acquire

---

[4]Three law review notes dealing with the effect of recitals upon operative clauses of contracts are: 35 Colum L Rev 565 (1935); 41 Cornell L Q 126 (1955); 25 Minn L Rev 924, 931 (1941).

only by purchase—stock which the father would not have sold to him had he thought that Donald would merely be an intermediary for its acquisition by plaintiffs under the agreement with their brother and sisters which the father was intentionally thwarting. The entire agreement was based upon the supposition that Taft Miller would continue to give stock in the ranch to his children or would leave it to them by inheritance. We therefore believe the contract was not intended to be binding under the circumstances which are disclosed here.

The judgment of the trial court is affirmed.