Argued and submitted March 29, affirmed August 2, 2000

# LANE UNIFIED BARGAINING COUNCIL/ SLEA/OEA/NEA,
*Petitioner,*

*v.*

# SOUTH LANE SCHOOL DISTRICT 45J3,
*Respondent.*

## (UP-36-98; CA A106346)

9 P3d 130

John S. Bishop argued the cause for petitioners. On the brief were Elizabeth A. Joffe and Bennett, Hartman & Reynolds.

Nancy Hungerford argued the cause for respondent. With her on the brief were Brian Hungerford and The Hungerford Law Firm.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

BREWER, J.

**BREWER, J.**

Petitioner Lane Unified Bargaining Council/SLEA/ OEA/NEA (Association) seeks judicial review of a final order of the Employment Relations Board (ERB) dismissing claims that respondent South Lane School District (District) violated ORS 243.672(1)(g) and (h) by refusing to arbitrate a grievance filed by Association on behalf of a member of its bargaining unit and by failing to reduce an alleged settlement of that grievance to a written and signed contract.[1] We review ERB's legal conclusions for errors of law and its factual findings for substantial evidence. ORS 183.482(8)(a) to (c). *See OSEA v. Rainier School Dist. No. 13*, 311 Or 188, 193, 808 P2d 83 (1991) (ORS 183.482 governs judicial review of an ERB order in a contested case). We affirm.

The following facts are summarized from ERB's findings and are supported by evidence in the record. In February 1998, Marc Rogge was in the first year of a two-year teaching contract with District. On February 27, District notified Rogge in writing that his performance did not meet District's "Teacher Evaluation Standards of Competent Performance" and that it was recommending to the South Lane School Board (Board) that the Board not extend Rogge's teaching contract for an additional two years. In the same letter, District also informed Rogge that the Board would make its decision whether to extend his contract on March 2, that Rogge would be placed on a "Program of Assistance for Improvement" on that date in order to help Rogge "correct areas of deficiencies," and that District would provide Rogge

---

[1] ORS 243.672 provides, in part:

"(1) It is an unfair labor practice for a public employer or its designated representative to do any of the following:

"* * * * *

"(g) Violate the provisions of any written contract with respect to employment relations including an agreement to arbitrate or to accept the terms of an arbitration award, where previously the parties have agreed to accept such awards as final and binding upon them.

"(h) Refuse to reduce an agreement, reached as a result of collective bargaining, to writing and sign such contract."

with details of the plan by March 13. The Board followed District's recommendation and on March 2 voted not to extend Rogge's contract.

On March 9, District notified Rogge in writing of the Board's action. District stated that Rogge "[would] be placed on a program of assistance for improvement as soon as the plan may be finalized" and that "[i]n the interim, [the February 27 letter] * * * should provide the basis for preparation and planning to make necessary improvements." In a March 10 letter, Association requested that District further explain the Board's March 2 decision not to extend Rogge's contract. On March 13, District responded with a letter explaining, among other things, that the March 9 letter to Rogge "specif[ies] that a [District] administrator has been assigned to work directly with [Rogge] within the next several weeks to develop and implement a program of assistance for improvement. We will keep the Association fully informed as the details of the [plan] are finalized."

On March 17, Rogge's school principal, Charlie Smith, met with Rogge and an Association representative. At the beginning of the meeting, the Association representative told Smith that Association was initiating a grievance regarding the Board's decision not to extend Rogge's contract. During the meeting, Smith, Rogge, and the Association representative also reviewed a draft plan of assistance that had been prepared by District.

The collective bargaining agreement (CBA) between Association and District provides a four-step grievance procedure, the purpose of which is to "resolve grievances at the lowest possible level * * *." "Level One" consists of an informal discussion with the school principal or the grievant's supervisor. If the dispute is not resolved, the grievant may advance the grievance to "Level Two" by filing a written grievance with the principal or supervisor, which specifies "the cause of the grievance." If not satisfied with the disposition at that level, the grievant may proceed to "Level Three" by appealing to the district superintendent. Finally, the grievant may request that the dispute be submitted to arbitration—a "Level Four" grievance.

On April 8, Association filed a Level Two grievance, alleging that District had violated several provisions of the CBA in its decision not to extend Rogge's teaching contract. District did not respond to the Level Two grievance. On April 16, Association advanced the grievance by submitting a Level Three written appeal to the district superintendent. On April 17, District issued a final written plan of assistance for improvement to Rogge. The plan stated that it began on April 16 and would continue through December 1.

On approximately May 26, District sent Association an unsigned written "resolution proposal" for Rogge's grievance. The proposal invited Association to "draft the details of a final signed resolution document" and asked Association to "[p]lease let [District] know whether this proposed grievance resolution is acceptable * * *." The concluding paragraph advised that "[District] reserves the right to review and recommend changes to the language suggested by [Association] prior to signing." Association representative Diane Trainque testified that Rogge accepted the proposal on June 4 and that she conveyed the acceptance to District on the same day by leaving a voicemail message on District Personnel Director Dennis Carr's telephone answering machine. Carr testified that he did not recall receiving such a message from Trainque.[2]

Trainque began drafting a settlement agreement on June 4 and mailed it to Carr on June 5. Later that day, Carr telephoned Trainque and purported to withdraw District's proposal. Trainque told Carr that Rogge had already accepted the proposal. Carr followed the telephone call with a letter to Trainque stating that District's refusal to pursue Rogge's grievance further was "based upon the statutory moratorium provisions in ORS 342.895(5)." In response, Association requested arbitration of Rogge's grievance on June 5, thereby advancing the grievance process to Level Four. On July 7, District informed Association that it

---

[2] ERB did not resolve the conflict in testimony because it concluded "for other reasons" that Association "failed to make unqualified and unconditional acceptance of [District's] offer." Because we conclude, for reasons discussed below, that the parties did not reach an enforceable settlement, we agree that the conflict in testimony need not be resolved.

declined to arbitrate Rogge's grievance during the moratorium period.

On July 29, Association filed an unfair labor practice complaint alleging that District violated ORS 243.672(1)(h) by failing to reduce the "[g]rievance settlement agreement to writing and to sign such agreement"; alternatively, Association alleged that District violated ORS 243.672(1)(g) by refusing to arbitrate the grievance. After a hearing, the administrative law judge (ALJ) issued recommended findings of fact to ERB. ERB then adopted its own findings, concluded that District did not violate either ORS 243.672(1)(g) or (h), and issued an order dismissing Association's claims. This petition for judicial review followed.

Association assigns several errors to ERB's order, two of which merit discussion. First, Association asserts that ERB "erred by concluding that [District] did not violate ORS 243.672(1)(g) by refusing to arbitrate the Rogge grievance." Second, Association argues that ERB "erred by concluding that [District] did not violate ORS 243.672(1)(h) by refusing to reduce to writing and sign" the settlement agreement. We address the latter argument first because, if the parties reached an enforceable agreement settling Rogge's grievance, it would be unnecessary to determine whether District violated ORS 243.672(1)(g) by refusing to arbitrate the grievance.

ORS 243.672(1)(h) provides that it is an unfair labor practice to "[r]efuse to reduce an agreement, reached as a result of collective bargaining, to writing and sign such contract." ERB concluded that Association had "properly alleged * * * a (1)(h) violation," because "the grievance procedure is the result of collective bargaining." District does not challenge ERB's construction of the statute. Assuming without deciding that ORS 243.672(1)(h) does apply in these circumstances, we nevertheless conclude that District did not violate the statute because the parties did not reach a settlement agreement.

ERB concluded that an agreement to settle Rogge's grievance was not reached, because Association did not "unequivocally accept the District's offer." Implicit in ERB's

decision is the assumption that Carr's May 26 memo to Trainque constituted an offer capable of acceptance so as to create an enforceable contract. On review, Association asserts that Rogge unconditionally accepted the May 26 proposal and that Trainque communicated that acceptance by leaving the voicemail message for Carr or, alternatively, by mailing the draft settlement agreement to him. According to Association, the parties' communications thus resulted in an enforceable settlement agreement. Among other responses, District contends that the May 26 document was merely a preliminary invitation to negotiate a resolution of the grievance. Alternatively, District argues that Association did not "accept" its proposal.

■ We review ERB's conclusion that the parties did not settle the grievance for errors of law. *Wagner v. Rainier Mfg. Co.*, 230 Or 531, 537, 371 P2d 174 (1962) (whether a contract is formed is a question of law); *Real Estate Loan Fund v. Hevner*, 76 Or App 349, 355, 709 P2d 727 (1985). We agree with ERB that the parties did not reach an enforceable settlement agreement. We conclude that the proposal could not have been accepted without submission of a conforming written agreement by Association—an event that, as explained below, never occurred. Carr invited the Association to do two things if the proposal was acceptable: first, to "let [him] know," something that could have been accomplished either by a telephone call or by submission of a draft settlement agreement and, second, to "draft the details of a final signed resolution document." Association assumes that it was enough to leave the message, regardless of whether or not the parties were ultimately able to agree on the language of a written agreement. In light of District's express reservation of the right to approve the language of any written draft, Association's assertion cannot be correct; the telephone message was neither necessary nor sufficient to fulfill the requirement for acceptance imposed by the proposal. In practical effect, by expressly reserving the right to review and propose changes to Association's settlement draft, District restricted Association's power of acceptance to submission of a conforming draft of the settlement agreement. *See Cochran v. Connell*, 53 Or App 933, 937, 632 P2d 1385, *rev den* 292 Or

109 (1981) (offeror may restrict the manner of acceptance, provided the intention to do so is clearly expressed).

Association argues that, even if Trainque's alleged voicemail message was not adequate to constitute an acceptance, the draft that she mailed to Carr on June 5 *was* a sufficient acceptance. Again, we disagree. District proposed a resolution that would "neither prejudice the contractual nor the statutory arguments of either [District] or [Association]." The draft submitted by Trainque provided that "[Association] and Marc Rogge * * * will withdraw, *without prejudice*, the currently pending grievance regarding [Rogge's] Program-of-Assistance and potential employment termination." (Emphasis added.) We agree with ERB's characterization of the tension between the parties' expressions:

"While Trainque may have verbally told Carr that the Association and Rogge accepted the District's offer on June 4, the document that she prepared immediately thereafter to detail the settlement contained terms that materially changed and qualified the District's offer. Specifically, the draft document contained a paragraph stating that the Association and Rogge would withdraw the pending grievance, *without prejudice*, in consideration for the other terms of the settlement. This qualification was not contained in the District's offer, nor was it discussed with the District. Withdrawing a grievance 'without prejudice' would allow for a new grievance to be brought on the same complaints. The point of the District's settlement offer, as stated in the offer, was to resolve Rogge's pending grievance." (Emphasis in original.)

Association argues that ERB's construction of the differences in the language of the documents is unduly rigorous in view of the fact that Trainque is not an attorney and because there was another provision in her draft that purported to release each party from "any and all claims known and unknown on account of, and in any way growing out of, the aforementioned proposed actions of the District and the contractual and legal remedies available to [Rogge]." At best, however, the release language in Trainque's draft contradicted the provision that the grievance would be dismissed without prejudice. It did not eliminate that provision and,

therefore, did not assure a final resolution of the grievance. Association's purported acceptance of Carr's proposal was thus equivocal and did not result in the creation of an enforceable agreement. *Wagner*, 230 Or at 538; *Blakeslee v. Davoudi*, 54 Or App 9, 14, 633 P2d 1302, *rev den* 290 Or 108 (1981).

The last point returns us to the language of the statute on which Association relies. ORS 243.672(1)(h) provides that it is an unfair labor practice for District to "refuse to reduce an agreement * * * to writing and sign such contract." If Carr's proposal was an operative offer, it required Association to reduce the parties' agreement to writing for their execution. Because Association did not produce a writing that conformed to its purported offer, District did not violate the statutory command.

We next address whether District violated ORS 243.672(1)(g) by refusing to arbitrate Rogge's grievance. ORS 243.672(1)(g) provides, in part, that it is an unfair labor practice to "[v]iolate the provisions of any written contract with respect to employment relations including an agreement to arbitrate * * *." Association asserts that the CBA required District to arbitrate Rogge's grievance. District responds that ORS 342.895(5) prohibited Rogge from pursuing arbitration of the grievance until his program of assistance for improvement was completed.

ORS 342.895(5) provides, in part:

"Notwithstanding ORS 243.650 to 243.782 or the provisions of any collective bargaining agreement entered into after August 15, 1997, *no grievance* or other claim of violation of applicable evaluation procedures, or fundamental. unfairness in a program of assistance for improvement, *shall be filed while a teacher is on a program of assistance.* All statutes of limitation and grievance timelines shall be tolled while the subject claims are held in abeyance under this moratorium provision. Except as provided in this subsection, the moratorium and tolling period ends on the date the program of assistance for improvement is completed, not to exceed one year, after which any claims subject to this provision *may be pursued* as otherwise provided by law or contract." (Emphasis added.)

Association replies that ORS 342.895(5) is inapplicable for any of three alternative reasons: Association contends that (1) Rogge was not on a program of assistance when the grievance was filed; (2) Rogge's grievance was not included within the class of grievances and other claims covered by the statutory moratorium; or (3) the parties permissibly waived the moratorium in the CBA. We address each argument in turn.

Association interprets ORS 342.895(5) as affecting the grievance only if Rogge was on a program of assistance for improvement at the time his grievance was initiated. From that premise, Association reasons that the statutory moratorium was inapplicable because the grievance was commenced on March 17 and Rogge was not on a program of assistance until his plan was "finalized" on April 17. In order to resolve Association's first argument, we must therefore determine *when* Rogge was placed on a program of assistance and, then, whether the grievance was subject to the statutory moratorium while he was on such a program.

■ ERB found that Rogge was effectively placed on a program of assistance on or before March 17:

> "Although Rogge's program of assistance was not finalized until April 17, he was told on February 27 that he would be on a program of assistance from *March 2, 1998 to March 1, 1999*. Furthermore, Rogge and Association representatives reviewed the first draft of the plan on March 17, the day the grievance was filed. Thus, Rogge was told he was on the plan well before he filed the grievance, and he knew of the plan's particulars when he filed the grievance. We find these facts sufficient to activate the grievance moratorium." (Emphasis in original; record citations and footnote omitted.)

District defends ERB's finding that Rogge was "effectively" on a program of assistance on or before March 17, because ORS 342.895(4)(b) required District to place Rogge on such a program after the Board did not extend his teaching contract. District's point is correct but it does not close the analytical loop. Although ORS 342.895(4)(b) required District to place Rogge on a program of assistance, the Board's decision not to extend Rogge's contract did not automatically place him on such a program. Instead, the statute required District to take

an affirmative step to place Rogge on a program. *See* ORS 342.895(4)(b) ("If the [Board] does not extend a contract teacher's contract * * * the district superintendent, or the superintendent's designee, *shall place* the teacher on a program of assistance for improvement.") (emphasis added).

ORS 342.815(7) provides that a "program of assistance for improvement" is a written plan for a contract teacher that with reasonable specificity

"(a) Helps teachers adapt and improve to meet changing demands of the Oregon Educational Act for the 21st Century in ORS chapter 329 if applicable.

"(b) Identifies specific deficiencies in the contract teacher's conduct or performance.

"(c) Sets forth corrective steps the contract teacher may pursue to overcome or correct the deficiencies.

"(d) Establishes the assessment techniques by which the district will measure and determine whether the teacher has sufficiently corrected the deficiencies to meet district standards."

Although the legislature has cautioned that a program of assistance for improvement "shall not be technically construed," ORS 342.895(5), a written plan must, with reasonable specificity, identify the specific deficiencies in the teacher's conduct, set forth the procedure to correct the deficiencies, and establish assessment techniques that measure his or her progress in correcting the deficiencies.[3]

■ As noted, several written communications were exchanged between District, Association, and Rogge before March 17. The first was District's February 27 letter, which notified Rogge that he would be placed on a program of assistance and that the program period "will be from March 2, 1998 to March 1, 1999." That letter also advised Rogge that his performance "failed to meet the administrative expectations as enumerated in *Teacher Evaluation Standards of*

---

[3] The parties do not assert that ORS chapter 329 is applicable to Rogge's program of assistance. That chapter does not impose requirements for a program of assistance resulting from the nonextension of a teacher's employment contract.

*Competent Performance* on Standard 1.2, Standard 3.2, Standard 4.2, and Standard 4.3." Although the letter set March 2 as the commencement date for the program and identified with reasonable specificity the deficiencies in Rogge's conduct, it did not set forth any procedure to correct the deficiencies nor did it establish any assessment techniques to measure Rogge's progress. Thus, the February 27 letter alone did not satisfy each of the statutory elements of a program of assistance for improvement.

The next relevant communication occurred on March 9 when District notified Rogge in writing that his contract would not be extended. That letter advised that Rogge would "be placed on a program of assistance for improvement as soon as the plan may be finalized" and that "[i]n the interim, [the February 27 letter] * * * should provide the basis for preparation and planning." Even when construed in a nontechnical sense, that notice also failed to fulfill the statutory requirements for a program of assistance for improvement. It merely informed Rogge that he would be placed on a program in the future and that the February 27 letter would, in the meanwhile, provide the basis for "preparation and planning." The fact that Rogge was not yet on a program of assistance is also confirmed by District's letter of March 13, which stated that a plan would be "developed" and "finalized" during the ensuing weeks.

On March 17—the day Rogge initiated his grievance—District delivered a document entitled "Plan of Assistance for Improvement" to Rogge. That document *did* satisfy the requisites of ORS 342.815(7) by identifying the deficiencies in Rogge's performance, set forth corrective steps, and established assessment procedures to measure his progress. However, the document was labeled "draft" and, although it included signature spaces for both Rogge and a District representative to execute on the last page, it was not signed. ERB did not make any findings or conclusions concerning the intended or actual effect of the March 17 draft. Instead, ERB emphasized that Rogge

"was told on February 27 that he would be on a program of assistance from *March 2, 1998 to March 1, 1999*. Furthermore, Rogge and Association representatives reviewed the

first draft of the plan on March 17, the day the grievance was filed. Thus, Rogge was told he was on the plan well before he filed the grievance, and he knew of the plan's particulars when he filed the grievance." (Emphasis in original; record citation omitted.)

The problem with ERB's analysis is that it focused only on what Rogge was told about when he would be placed on a plan and on what he knew of the details of the draft plan when he initiated his grievance. ERB did not expressly determine when, in fact, Rogge was placed on the plan. However, ERB's own findings—which are supported by substantial evidence—show that Rogge was not on a program of assistance when he initiated his grievance. Despite the statement in its February 27 letter that a plan would take effect on March 2, District's March 9 letter stated that Rogge unilaterally would be "placed on a program of assistance for improvement *as soon as the plan may be finalized.*" (Emphasis added.) That intention was reiterated in District's March 13 letter. ERB correctly identified the document delivered to Rogge on March 17 as a "draft" and, thus, not a *final* plan. Instead, ERB found that "[on] April 17, Smith issued Rogge's final written plan of assistance for improvement." That plan provided for a program period of "April 16, 1998," to "December 1, 1998." In short, Rogge was not on a plan of assistance until the "final" plan was issued and signed by District on April 17.

As noted, Association advanced the grievance to Level Two on April 8—before Rogge was placed on a plan of assistance. Furthermore, the grievance had reached Level Three by the time the plan took effect. However, Association does not complain on review about District's handling of those steps of the grievance process. Its objection is to District's refusal to advance the grievance to arbitration pursuant to Level Four of the CBA procedure. ERB found, and Association does not dispute, that the grievance process did not reach Level Four until Trainque requested arbitration on June 5, 48 days *after* Rogge was placed on a program of assistance. The decisive question of statutory construction, therefore, is whether the pursuit of the grievance was suspended while Rogge was on the plan of assistance. We conclude that it was.

■ We acknowledge that ERB and the parties have not framed the issue as we have just done. ERB determined that the Rogge grievance was "filed" on March 17. In its analysis of the timing of the grievance, ERB stated: "Rogge and Association representatives reviewed the first draft of the plan on March 17, *the day the grievance was filed.*" (Emphasis added.) ERB did not consider whether the statutory moratorium was limited to the initiation of new grievances and the parties, likewise, have not analyzed that question. In order to properly construe ORS 342.895(5), however, we need not confine our analysis to the arguments of the parties or the path taken by ERB. *Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997); *State v. Williams*, 161 Or App 111, 116, 984 P2d 312 (1999) (citing *Stull* for the rule that we are not bound by the parties' formulation of the issues presented if it would force us to misinterpret a statute). For the reasons that follow, we conclude that the statutory moratorium does not merely prohibit the filing of subject grievances but also abates the pursuit of grievances that were pending when a teacher was placed on a program of assistance.

■ In construing ORS 342.895(5), we examine its text and context and, if necessary, its legislative history and other aids to construction. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). The first sentence of ORS 342.895(5) provides that no grievance "shall be filed while a teacher is on a program of assistance." If that sentence were the only description of the subsection's scope, we would conclude that the moratorium applies only to the commencement of grievances. However, succeeding sentences in the statute make clear that the moratorium also applies to pending grievances. The second sentence states that "[a]ll statutes of limitation *and grievance timelines* shall be tolled while the subject claims *are held in abeyance* under this moratorium provision." (Emphasis added.) The legislature's use of the plural form of the word "timeline" is instructive. There would have been little purpose in referring to any timeline other than one governing the initiation of grievances, unless the legislature also intended to suspend the pursuit of previously initiated grievances as well. Furthermore, the moratorium requires that subject claims be "held in abeyance," implicitly referring to pending claims. "Abeyance" means

"temporary inactivity or suppression: cessation or suspension." *Webster's Third New Int'l Dictionary*, 3 (unabridged ed 1993). Its ordinary meaning primarily connotes the cessation of an *already existing* activity, law or process whose course or effect is interrupted, as opposed to one that has not yet commenced, such as "‹statutes fallen into abeyance› ‹a rule in abeyance since 1935›." *Id.* A common example of the term's use in a procedural context is the "abeyance" of a pending appeal. *See* ORAP 8.25(2). If only the initiation of subject claims were proscribed by the moratorium, there would be no point in holding grievances in abeyance.

Finally, the third sentence of the subsection provides:

> "Except as provided in this subsection, the moratorium and tolling period ends on the date the program of assistance for improvement is completed, not to exceed one year, after which any claims subject to this provision may be *pursued* as otherwise provided by law or contract." (Emphasis added.)

The first sentence of subsection (5) regulates the *filing* of subject claims. The third sentence of subsection (5), on the other hand, provides that subject claims may be *pursued* when the moratorium ends. The pursuit of a grievance could, logically, refer to the prosecution of any step in the grievance process and not merely to its commencement. The legislature's repeated use of the word "pursued" later in the same subsection supports that view. Subsection (5) also provides:

> "If a contract teacher does not appeal a contract non-extension or dismissal to the Fair Dismissal Appeals Board but instead *pursues* contract grievances to arbitration alleging a violation of evaluation procedures or fundamental unfairness in a program of assistance for improvement, the arbitrator shall not have authority to award reinstatement of the contract teacher * * *."

The arbitration of grievances is typically pursued at the end of an unsuccessful informal process. That is certainly the case here, where Association sought arbitration at Level Four of the process, long after the grievance was first filed. Thus, *pursuit* of a grievance, as applied to ORS 342.895(5), means more than the mere initiation of a subject claim. It

would make little sense for the legislature to broadly authorize the *pursuit* of claims at the end of a moratorium period if only their initiation had ever been proscribed.

The legislature's choice to hold "in abeyance" and limit the "pursuit" of grievances and to toll their "timelines," demonstrates an intention that the moratorium apply to the ongoing prosecution of an already initiated grievance. We conclude, therefore, that Rogge's grievance—if it was otherwise subject to the moratorium—was held in abeyance while he was on a program of assistance.

■ We next address whether Rogge's grievance fell within the class of grievances or other claims subject to the moratorium. The first sentence of ORS 342.895(5) provides that "no grievance or other claim of violation of applicable evaluation procedures, or fundamental unfairness in a program of assistance for improvement, shall be filed while a teacher is on a program of assistance."

Rogge's grievance alleged that District violated its own *evaluation procedures* and those of the CBA in its actions leading up to the recommendation that the school board not extend Rogge's teaching contract. The grievance specifically alleged that District violated the CBA by: (1) failing to comply with the CBA's employee discipline provision's "just cause" standard; (2) relying on improperly processed complaints in its evaluation; (3) placing information in Rogge's file without notifying him; and (4) generally failing to follow its own "[p]olicies and practices in its evaluation of [Rogge]." Association asserts that the "moratorium plainly does not cover grievances that challenge evaluation procedures used *before* a program of assistance is issued." (Emphasis in original.) Association interprets the word "applicable," which directly precedes the term "evaluation procedures" in the statute, as limiting the scope of the moratorium to grievances that allege a violation of evaluation procedures contained in a program of assistance itself—and as excluding the process used to evaluate whether a teacher's employment contract should be "not extended."

In effect, Association asks us to conclude that the phrase "in a program of assistance for improvement" relates back, not only to the phrase "fundamental unfairness," but

also to the phrase "applicable evaluation procedures." However, the grammatical structure of the text at issue indicates otherwise. Specifically, the legislature's use of commas to set off the "fundamental fairness in a program of assistance for improvement," suggests that the phrase "in a program of assistance for improvement" relates only to the phrase "fundamental unfairness" and not to the phrase "applicable evaluation procedures." *See State v. Webb*, 324 Or 380, 927 P2d 79 (1996) (considering placement of commas in analyzing meaning of statutory provision).

■ The context of ORS 342.895(5) supports that conclusion. ORS 342.895 is part of the Accountability for Schools in the 21st Century Law, which includes, as context for its construction, ORS 342.805 to ORS 342.937. ORS 342.850 (1) and (2) require annual performance evaluations of probationary teachers and also require that school boards "develop an evaluation process" for contract teachers. That evaluation process must include, among other things, performance standards. ORS 342.850(2)(b)(A). The performance standards are used in determining whether a teacher's employment contract should not be extended on the grounds of "inadequate performance." ORS 342.865(1), (2). Thus, the statutory context of ORS 342.895(5) reveals that a claimed violation of "applicable evaluation procedures" includes violations of the evaluation procedures used to determine whether a teacher's performance is sufficiently adequate to extend his or her employment contract. Rogge's grievance alleges precisely that sort of violation. Therefore, it was subject to the statutory moratorium unless, as Association finally argues, the parties agreed to waive the moratorium. We turn to that argument.

■ ORS 342.910(2) provides that:

> "A school district and an exclusive bargaining representative of teachers may agree to waive all or any part of the rights and procedures provided under ORS 342.805 to 342.937 if third party review of any dismissal or non-extension of a contract teacher is available."

Association asserts that Article 12(F)(5) of the CBA constitutes a waiver of the moratorium. That provision states:

"[A] contract teacher who is non-extended shall have the option of challenging the District's actions under ORS 342.805 to 342.930 or through a just cause grievance, using the process of Article 3 of this Agreement. If the employee chooses the grievance option, *the parties agree to waive the rights, limitations, and procedures under [ORS] 342.805 to 342.930.*" (Emphasis added.)

ERB acknowledged that Association's argument "appear[ed] cogent" if Article 12(F)(5) were considered in isolation. However, ERB rejected Association's waiver theory because "the parties expressly incorporated the moratorium provision of ORS 342.895(5)" in Article 3 of the CBA. Article 3(C)(1) provided, in part:

"No grievance or other claim of violation of applicable evaluation procedures, or fundamental unfairness in a program of assistance for improvement, shall be filed while a teacher is on a program of assistance. All statutes of limitation and grievance timelines shall be tolled while the subject claims are held in abeyance under this moratorium provision.

"Once this tolling period ends, pursuant to ORS 342.895(5), any claims subject to this provision may be pursued as otherwise provided by law or contract."

We agree with ERB.

In construing a CBA, we use the same methodology employed in construing any other contract. *OSEA*, 311 Or at 194. ERB correctly determined that, in order to interpret Article 12(F)(5), the text of that provision must be examined in the context of the document as a whole. *Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997). If possible, the agreement should be construed to avoid inconsistencies and to give meaning to all of its terms. *Standley v. Standley*, 90 Or App 552, 556, 752 P2d 1284, *rev den* 306 Or 413 (1988).

Article 12(F)(5) generally permitted Rogge to elect unilaterally to waive the "procedures under ORS 342.805 to [ORS] 342.930" and to proceed with a "just cause" grievance. However, that provision also required Rogge to use the grievance "process of Article 3." As ERB observed, Article 3(C)(1) incorporated the exact language of the moratorium provision found in ORS 342.895(5) and expressly incorporated the statute for determining the length of the moratorium. The CBA

did not provide that a contract teacher may unilaterally elect to waive any of its *grievance* provisions, including the moratorium provision. Therefore, Association's purported waiver of the statutory moratorium pursuant to Article 12(F)(5) by electing to follow the process of Article 3 was of no avail.

In conclusion, ERB correctly dismissed Association's unfair labor practice claims. District did not violate ORS 243.672(1)(h) by refusing to reduce to writing and sign a settlement agreement, because the parties did not reach an enforceable agreement resolving the grievance. Nor did District violate ORS 243.672(1)(g) for refusing to arbitrate Rogge's grievance: The grievance moratorium in ORS 342.895(5), incorporated into the CBA, prevented Rogge from pursuing arbitration while he was on a program of assistance for improvement.

Affirmed.