Argued and submitted July 9, 2001; resubmitted en banc February 6, reversed and remanded April 24, petition for review denied August 6, 2002 (334 Or 491)

# PORTLAND FIRE FIGHTERS' ASSOCIATION, LOCAL 43,
*Petitioner,*

*v.*

# CITY OF PORTLAND,
*Respondent.*

# UP-58-99; A111627

45 P3d 162

Monica A. Smith argued the cause for petitioner. On the brief were Robert Reid and Reid & Bates.

Rudolph S. Westerband argued the cause and filed the brief for respondent.

Before Deits, Chief Judge, Edmonds, Landau, Haselton, Armstrong, Linder, Wollheim, Kistler, Brewer, and Schuman, Judges.

Landau, J., dissenting.

**BREWER, J.**

Petitioner, Portland Fire Fighters' Association, Local 43 (the Association), seeks judicial review of a final order of the Employment Relations Board (ERB). In that order, ERB dismissed the Association's complaint, alleging that the City of Portland (the city) violated ORS 243.672(1)(g) by refusing to arbitrate a grievance concerning retiree health insurance benefits.[1] We review ERB's factual findings for substantial evidence and its legal conclusions for errors of law. ORS 183.482(8); *Lane Unified Bargaining v. South Lane Sch. Dist.*, 169 Or App 280, 282, 9 P3d 130 (2000), *rev allowed* 331 Or 692 (2001). Because ERB erroneously concluded that the parties' collective bargaining agreement (CBA) does not authorize the Association to file a "retiree grievance" and have that grievance ultimately arbitrated, we reverse and remand.

The parties stipulated to the following facts before ERB:

"1.   [The Association] is the exclusive representative of a bargaining unit of employees employed by [the city], a public employer;

"2.   The Association and [the city] are parties to a [CBA] effective July 1, 1996 through June 30, 1999. (Joint Exhibit 1; [CBA]);

"3.   On February 23, 1999, the Association filed a grievance with [the city]. (Joint Exhibit 2; grievance);

"4.   By letter dated March 22, 1999, [the city] denied the grievance. (Joint Exhibit 3; March 22, 1999 letter from Wall to Chamberlain);

"5.   The parties have a good faith dispute as to whether this retiree grievance is substantively arbitrable, in light of

---

[1] ORS 243.672 provides, in part:

"(1) It is an unfair labor practice for a public employer or its designated representative to do any of the following:

"* * * * *

"(g) Violate the provisions of any written contract with respect to employment relations including an agreement to arbitrate or to accept the terms of an arbitration award, where previously the parties have agreed to accept such awards as final and binding upon them."

the Board's decision in *McMinnville Education Association v. McMinnville School District #40*, Case No. UP-78-94, 16 PECBR 107 (1995). Therefore, [the city] 'declines' to arbitrate the matter and the Association is pursuing this 'friendly' refusal to arbitrate unfair labor practice. (Joint Exhibit 4; June 30, 1999 letter from Colombo to Reid & Joint Exhibit 5; July 1, 1999 Reid response to Colombo);

"6. The representatives signing this stipulation: (a) warrant that they are authorized by their respective principals to do so; (b) represent that the above statements are accurate and constitute all of the evidence that either party desires to present to the Board in this matter; (c) waive formal service of the complaint; (d) waive review of Administrative Procedure Act rights (ORS 183.413); and (e) waive a hearing on the facts to be considered by the Board."

The parties submitted the stipulation, together with Joint Exhibits 1-5, to ERB, and both parties waived a hearing.

The grievance filed by the Association alleged that the city had violated the CBA by requiring retired employees and their spouses to pay higher health-care premiums than the city paid for active employees.[2] The grievance form used by the Association described the dispute as "[t]he specific terms of the contract are violated by requiring a retiree or retiree's spouse to pay higher health benefit premiums than the rate charged for active employees[.]" The grievance requested as relief that the city "provide remuneration to

---

[2] The Association specifically alleged that the city had violated Article 18, subsection E, of the CBA, which provides, in part:

"The City shall make available to a retired employee or to a retired employee's spouse and eligible children, or to the retiree's surviving spouse and eligible children, or to the retiree's surviving spouse, the same medical, dental and vision coverage to active employees. The cost of the coverage shall be borne by the retiree or his/her surviving spouse.

"* * * * *

"A retiree or a retiree's surviving spouse who elects to participate in an insured health plan maintained by the City (e.g., Kaiser) will pay rates charged by the insurer for participants in their age group. If the insurer charges a higher rate for participants who are over 65, the City will allow the participant to switch to its self-insured plan. A retiree or a retiree's spouse who elects participation in a self-insured health plan offered by the City will pay the rate charged for active employees."

retirees or retiree's spouses for any premiums paid in violation of the contract" and that the city "follow [the] contract's terms as to retiree and survivor benefits, prospectively."

■■ The procedure under which the Association filed the grievance is detailed in Article 14 of the CBA. Because it is central to our analysis, we set out Article 14 in full:

"Section 1. General. To promote better employer-employee relationships, both parties pledge their immediate cooperation to settle any grievance or complaints that might arise out of the application of this Agreement and the following procedure shall be the sole procedure to be utilized for that purpose. Any settlement of a grievance under this Article, which would alter or amend the terms of this agreement or any side bar agreement or memorandum of understanding shall not be binding on either party unless the settlement, or memorandum of understanding or a side bar agreement, is approved in writing by the president of the Association and the Director of the Bureau of Personnel. Facts and practices that occurred prior to October 28, 1994 shall not be relevant nor used as a basis for any grievance raised by any Fire Battalion Chief.

"Section 2. Process.

"Step 1. The aggrieved employee or the Association, with or without the employee, may take up the grievance or dispute with the employee's supervisor outside the bargaining unit within five (5) working days of its occurrence.

"Step 2. If the matter is not settled within ten (10) working days of reference to the supervisor, the matter shall be reduced to writing, including but not limited to the nature of the grievance, the section of the contract allegedly violated, specifically how the contract has been violated, and any requested action, and presented to the Chief within ten (10) working days of the expiration of the ten (10) working-day period for settlement with the supervisor.

"Step 3. If the matter is not settled within ten (10) working days of receipt by the Chief, the Association shall have the right to submit the grievance in writing to the Personnel Director within ten (10) working days of the expiration of the ten (10) working-day period for settlement with the Bureau Head. The Personnel Director shall make a recommendation to the Commissioner in charge.

"Step 4. Should the parties fail to settle the dispute at the level of the Personnel Director and Commissioner in charge within two (2) weeks from the date of submission to the Personnel Director, the Association shall have the right to submit the matter to arbitration. In the event the Association elects to do so, it must notify the Personnel Director of its decision in writing within ten (10) working days from the date upon which the two (2) week period ends. After the grievance has been so submitted, the parties or their representatives shall jointly request the Employment Relations Board for a list of names of seven (7) arbitrators. The parties shall select an arbitrator from that list by such method as they may jointly select, or if they are unable to agree upon a method, then by the method of alternate striking of names under which the grieving party shall strike the first name objectionable to it, and the Employer shall then strike the first name objectionable to it. The final name left on the list shall be the arbitrator.

"The arbitrator's decision shall be final and binding on both parties, but the arbitrator shall have no power to alter in any way the terms of this agreement. The decision of the arbitrator shall be within the scope and terms of this agreement and the arbitrator shall be requested to issue the decision in writing, indicating findings of fact and conclusion, to both parties within thirty (30) days after the conclusion of the proceedings, including filing of briefs, if any. It may also provide retroactivity not exceeding sixty (60) days prior to the date the grievance was filed and shall state the effective date.

"Expenses for the arbitrator's services and the proceedings shall be borne by each party in equal share. However, each party shall be responsible for any other expenses incurred by them.

"The parties agree that the grievance procedure is the exclusive remedy for disputes regarding issues covered by the bargaining agreement. As such, the parties agree not to represent or support actions by employees, outside of the grievance procedure, on issues covered by the bargaining agreement. This does not prohibit the Union from using any outside process, as provided by ORS 243.650 to 243.782, for enforcement of the contractual grievance procedure."

After the city denied the grievance, the Association sought to submit the dispute to arbitration under Step 4 of

the dispute resolution procedure. The city declined to arbitrate the dispute. The Association then filed an unfair labor practice complaint with ERB, alleging that the city had violated the CBA by refusing to submit the grievance to arbitration.[3] After a hearing, the hearing officer issued recommended findings of fact, conclusions of law, and a proposed order, concluding that the city had committed an unfair labor practice by improperly refusing to arbitrate the grievance. In a split decision, ERB reversed the hearing officer's proposed order. The Association seeks review of ERB's final order dismissing the complaint. The decisive issue on review—as it was before ERB—is whether the CBA permits the Association to compel the city to arbitrate disputes concerning retiree health insurance benefits.

CBAs generally are interpreted in the same manner as are other contracts. *OSEA v. Rainier School Dist. No. 13*, 311 Or 188, 194, 808 P2d 83 (1991). To interpret disputed contract provisions, we first examine "the text of the disputed provision, in the context of the document as a whole." *Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997). "Unambiguous contracts must be enforced according to their terms." *Rainier School Dist. No. 13*, 311 Or at 194. A contract is ambiguous if it can reasonably be given more than one plausible interpretation. *See North Pacific Ins. Co. v. Hamilton*, 332 Or 20, 25, 22 P3d 739 (2001). Where provisions of a contract are mutually inconsistent, the contract is ambiguous as to the subject matter of those provisions. *See Miller v. Miller*, 276 Or 639, 647, 555 P2d 1246 (1976) (holding that, where the recital clause of a contract is inconsistent with an operative provision of the contract, the contract as a whole is ambiguous); *see also Timber Access Ind. v. U. S. Plywood*, 263 Or 509, 514, 503 P2d 482 (1972) ("Because the provisions of the two paragraphs are inconsistent, the contract is ambiguous."). If the contract is ambiguous, we "examine extrinsic evidence of the contracting parties' intent," if it is available. *Yogman*, 325 Or at 363. If the ambiguity persists, we resolve it by resorting to appropriate maxims of contractual construction. *Id.* at 364.

---

[3] The merits of the underlying grievance concerning retiree health-care premiums were not before ERB, and we also do not consider that issue on review of ERB's order.

■      ERB determined that its "review of the grievance and arbitration provision and the recognition clause [led it] to conclude that the parties here did not agree to arbitrate disputes concerning retirees' health insurance."[4] *Portland Fire Fighters' Association, Local 43 v. City of Portland*, 18 PECBR 723, 730 (2000). Because it concluded that the CBA was unambiguous after examining its text and context, ERB did not address the second or third tier of contractual interpretation. We review ERB's interpretation of the CBA for errors of law. *Lane Unified Bargaining*, 169 Or App at 282.

In asserting that the CBA is unambiguous, the city relies in part on Article 1, which provides that the CBA's purpose includes "the establishment of wages, hours and working conditions of *members of the bargaining unit*." (Emphasis added.) The city also cites Article 2, which recognizes the Association as the bargaining agent "for the purposes of establishing wages, hours and working conditions *for all sworn personnel of the Fire Bureau*." (Emphasis added.) According to the city, "[t]he parties are obviously referring to employees in both provisions, not to retirees."[5]

The dissent points to several references to the term "employees" in the grievance procedure provision itself, that is, in Article 14 of the CBA. According to the dissent, the retirees here are not employees and, thus, any grievance filed on their behalf is not subject to the procedure outlined in the CBA. The dissent also concludes that the procedure is unworkable and therefore must be inapplicable to this complaint, because, at the first step of the grievance procedure, the employee or the Association must file a grievance with "the employee's *supervisor*." (Emphasis added.) The dissent—like the city—reasons that, because a retiree has no supervisor, the grievance procedure cannot apply.

___

[4] The recognition clause, Article 2 of the CBA, provides:

"The City recognizes the Union as the sole and exclusive bargaining agent for the purposes of establishing wages, hours and working conditions for all sworn personnel of the Bureau of Fire, excluding the City Fire Chief, Fire Marshal, Division Chief, Deputy Chief, and Assistant Fire Marshal."

[5] Although the city cites no particular reference in the record that establishes that retired employees are not members of the bargaining unit covered by the CBA and are no longer sworn personnel, the Association does not challenge those assertions. We assume for purposes of discussion that the city's assertions are correct.

Contrary to those assertions, however, several provisions of the CBA support the conclusion that the parties' dispute is nonetheless arbitrable. Read as a whole, Article 14 provides for a *generally applicable* grievance procedure, which has arbitration as its final level of dispute resolution. Article 14, section 1, provides, in part:

"To promote better employer-employee relationships, both parties pledge their immediate cooperation to settle *any grievance or complaints* that might arise out of the application of this Agreement and the following procedure shall be the *sole procedure to be utilized* for that purpose." (Emphasis added.)

Additionally, the final paragraph of Article 14 provides that "[t]he parties agree that the grievance procedure is *the exclusive remedy* for disputes regarding *issues covered by the bargaining agreement.*" (Emphasis added.) The subject of retiree health benefits is undisputably one of the "issues covered by the bargaining agreement." Moreover, the underlying dispute regarding retiree health benefits is a "complaint" or a "grievance" arising out of the application of Article 18 of the CBA.

In the view advocated by the city and the dissent, the scope of the grievance provision is limited exclusively to the interests of current employees, because it refers to "employer-employee relationships" and "aggrieved employee[s]"; the CBA focuses primarily on the Association's representation of members of the bargaining unit, as opposed to retirees. In another plausible view, though, no such limitation exists, because the grievance procedure is the exclusive remedy for *all* disputes regarding issues covered by the CBA. In that view, if the Association could not grieve retiree health insurance disputes, there would be no remedy under the CBA for a violation of the city's obligation to "make available to a retired employee * * * the same medical, dental and vision coverage offered to active employees."

In rejecting the plausibility of that second interpretation, the dissent concludes that the grievance procedure is the exclusive remedy only for "employee grievances." 181 Or

App at 96-97, 99, 100, 101-02, 103-04 (Landau, J., dissenting). If the CBA actually contained such a limitation, the dissent might be correct. However, by so circumscribing the grievance procedure, the dissent both inserts words into the contract and omits others, something the legislature has instructed us not to do. ORS 42.230. Contrary to the dissent's assertion, the grievance procedure expressly applies to *"any* grievance or complaint" arising out of the application of the CBA, and the "grievance procedure is the exclusive remedy for *disputes*"—not "employee disputes" or "employee grievances" "regarding issues covered" by the CBA. (Emphasis added.) The CBA's primary focus on the rights of active employees does not necessarily mean that the parties did not intend to permit the Association to grieve any other type of dispute arising out of the CBA, regardless of whom it affects.

The dissent accuses us of setting up a false ambiguity by disregarding the steps in the grievance procedure that involve the participation of supervisors and other preliminaries to arbitration. To the contrary, we have not ignored the provisions that the dissent emphasizes but, rather, have declined the invitation to exalt them above other provisions of the CBA. The CBA easily could be read as either party urges if we were free, by means of contextual construction principles, to ignore the provisions on which the other party relies. However, neither of the parties' competing interpretations readily could prevail without reconstructing the CBA as a whole into a state of artificially imposed harmony. Thus, it appears to be ambiguous. *See Miller*, 276 Or at 647; *Timber Access Ind. Co.*, 263 Or at 514.

To confirm that conclusion, we consider certain statutory rules of contract construction found in ORS chapter 42. *See Abercrombie v. Hayden Corp.*, 320 Or 279, 292, 883 P2d 845 (1994) (holding that ORS 42.220 authorizes a court to consider extrinsic evidence to determine *if* the terms of an agreement are ambiguous).[6] For present purposes, however,

---

[6] In light of the linear methodology adopted in *Yogman,* it is not entirely clear to what extent statutory maxims of construction should be considered at the various levels of analysis. For example, *Yogman* instructed that extrinsic evidence should be considered only if the text of an agreement, viewed in context, is ambiguous. 325 Or at 361-64. That principle suggests that the rule stated in ORS 42.220

those rules either simply restate our task, *e.g.*, ORS 42.240; ORS 42.230, or otherwise are not especially useful. A statutory rule of the latter sort is found in the second sentence of ORS 42.240, which provides that "a particular intent shall control a general one that is inconsistent with it." The parties have offered no guidance as to whether any provisions of the CBA properly may be regarded as general or particular. Nor do the provisions at issue appear to be susceptible to such an analysis. For example, as discussed above, Article 14 provides, in part, that the grievance procedure applies to "any grievance or complaints" arising out of the application of the CBA and that the grievance procedure is the "exclusive remedy for issues covered by" the CBA. At the same time, in setting out the "steps" of the grievance procedure, Article 14 provides in part that an "aggrieved employee * * * may take up the grievance * * * with the employee's supervisor." Contrary to the dissent's apparent argument, however, it is by no means obvious that the latter provision—which relates to only one of four "steps" of the grievance procedure and which, in any event, appears to be permissive rather than mandatory in nature—properly can be deemed to restrict the indisputably broad applicability of the grievance procedure as a whole, as demonstrated in the former provisions. In short, in this instance, application of the rule set out in the second sentence of ORS 42.240 appears as likely to obscure the parties'

---

should be considered only at the second level. Although we previously have recognized the apparent tension between *Yogman* and *Abercrombie*, we have continued to follow *Abercrombie*. *OTECC v. Co-Gen*, 168 Or App 466, 476 n 8, 7 P3d 594 (2000), *rev den* 332 Or 137 (2001). A related concern is whether other statutory rules should be applied at the first level in the quest to ascertain the parties' intent or, conversely, should be considered only at the second or third level. Although, read uncritically, *Yogman* might appear to confine the consideration of statutes prescribing maxims of construction to the third level of analysis, it seems clear that maxims instructing judges how to determine the parties' intent from the words they have chosen properly may be considered at the first level. *See, e.g.*, ORS 42.230; ORS 42.240; *see also Kell v. Oppenlander*, 154 Or App 422, 426, 961 P2d 861 (1998) (applying ORS 42.230 at the first level of *Yogman* methodology); *cf. State ex rel Juv. Dept. v. Alderson*, 146 Or App 185, 189, 932 P2d 97 (1997) (restating rule that, at the first level of *statutory* construction, the court looks to maxims that "bear directly" on how to read the language of the statute). On the other hand, statutory rules that authorize consideration of extrinsic evidence may be implicated at the second level of analysis rather than the first or third. *See, e.g.*, ORS 42.250; ORS 42.260. Regardless of whether we employ certain textual maxims of construction at the first level, however, the CBA *is* ambiguous, and, thus, we should complete the *Yogman* analysis.

intent as it is to assist in determining it. Because resort to textual maxims of construction does not plausibly reconcile the conflicting provisions of the CBA, it is ambiguous. *Miller*, 276 Or at 647; *Timber Access Ind.*, 263 Or at 514.

■        Where, as here, there is no extrinsic evidence to clarify the parties' intent beyond the stipulated facts and exhibits, we must resort to relevant third-level maxims of contract construction. *Yogman*, 325 Or at 364. One such maxim controls the outcome of this case. Where the arbitrability of a particular issue under a collective bargaining agreement is in dispute, ERB must order arbitration unless it can say " 'with *positive assurance* that the arbitration clause is not susceptible [to] an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.' " *Corvallis Sch. Dist. v. Corvallis Education Assn.*, 35 Or App 531, 535, 581 P2d 972 (1978) (emphasis added) (quoting *Steelworkers v. Warrior & Gulf Co.*, 363 US 574, 582-83, 80 S Ct 1347, 4 L Ed 2d 1409 (1960)).[7] Here, the ambiguity as to the arbitration provision's coverage demonstrates an absence of positive assurance that the dispute is *not* arbitrable, and, thus, it *is* arbitrable. Accordingly, the city committed an unfair labor practice in violation of ORS 243.672(1)(g) by refusing to arbitrate the Association's grievance regarding retiree health benefits. ERB erred in concluding otherwise.

Reversed and remanded.

**LANDAU, J.,** dissenting.

The collective bargaining agreement unambiguously provides for arbitration of employee grievances only. It spells out a four-step grievance process. Arbitration is the fourth step, but it is expressly contingent on the completion of the other three steps, each of which is limited to employee grievances. Thus, arbitration is not generally available to resolve any dispute arising under the agreement. It is applicable

---

[7] *Warrior & G. Nav. Co.* is part of the United States Supreme Court's so-called Steelworkers trilogy, which also includes *Steelworkers v. American Mfg. Co.*, 363 US 564, 80 S Ct 1343, 4 L Ed 2d 1403 (1960), and *Steelworkers v. Enterprise Corp.*, 363 US 593, 80 S Ct 1358, 4 L Ed 2d 1424 (1960).

only to employee grievances that cannot be resolved by completion of the first three steps of the dispute resolution process that the contract details. The majority ignores the language of the agreement in concluding that it provides for a "generally applicable grievance procedure" for all disputes arising under the agreement. I therefore dissent.

The controlling legal principles are straightforward enough. A collective bargaining agreement is a contract, which we must review in accordance with basic principles of contract construction. *OSEA v. Rainier School Dist. No. 13*, 311 Or 188, 194, 808 P2d 83 (1991). That means that our first task is to determine whether, as a matter of law, the agreement is ambiguous, that is, whether it is reasonably capable of more than one interpretation. *North Pacific Ins. Co. v. Hamilton*, 332 Or 20, 25, 22 P3d 739 (2001).

In determining whether an agreement is ambiguous, we must do more than assess whether a particular disputed term is, in the abstract, capable of more than one meaning; rather, we must determine that, *in the context of the agreement as a whole*, that is the case. *Id.; see also Yogman v. Parrott*, 325 Or 358, 363, 937 P2d 1019 (1997). Similarly, we may not simply juxtapose two portions of an agreement that, when taken from their context, are arguably inconsistent; rather, we must construe the contract as a whole. *New Zealand Ins. v. Griffith Rubber*, 270 Or 71, 75, 526 P2d 567 (1974). Only when we cannot reconcile conflicting provisions in their context may we conclude that an agreement is ambiguous. *See, e.g., LaPointe's, Inc. v. Beri, Inc.*, 73 Or App 773, 778, 699 P2d 1173 (1985) (agreement was ambiguous because "we cannot, by looking at the agreements as a whole, reconcile the inconsistency"); *Far West Reforesters, Inc. v. Dept. of Forestry*, 61 Or App 138, 143, 656 P2d 374 (1982) (agreement was ambiguous because court could not, "by simply looking at the contract as a whole, reconcile the inconsistent portions"). If, and only if, we conclude the agreement is ambiguous, we may resort to maxims of construction, including the familiar rule that doubts about arbitrability are resolved in favor of arbitration. *Joseph Education Assn. v. Joseph Sch. Dist. No. 6*, 180 Or App 461, 467, 43 P3d 1187 (2002).

The language of the arbitration article of the collective bargaining agreement in this case is clear. It begins by reciting that its purpose is "[t]o promote better employer-employee relationships." Consistently with that end, it provides a procedure for the resolution of disputes between the city and an aggrieved employee. That four-step process is declared to be "the sole procedure" for resolving disputes arising out of the application of the agreement. The first step in that process is:

> "The aggrieved employee or the Association, with or without the employee, may take up the grievance or dispute with the employee's supervisor outside the bargaining unit within five (5) working days of its occurrence."

Thus, the dispute or grievance must involve an aggrieved employee and must be submitted to "the employee's supervisor." Either the employee or the Association may take up the grievance, but, at all events, it must involve an employee and must be taken up with the employee's supervisor. If the Association could take up any dispute, whether or not it involves an aggrieved employee, then the reference to taking up the dispute with "*the employee's* supervisor" makes no sense. If there is no aggrieved employee, there is no employee's supervisor with whom to take up the grievance or dispute as the first step of the process—which, once again, is the "sole procedure" for arbitrating covered disputes—requires.

The second step provides that, "[i]f the matter is not settled within ten (10) working days of reference to the supervisor, the matter shall be reduced to writing * * * and presented to the Chief." Thus, the second step—presentation of the grievance to the Chief—is triggered by the inability to settle by "reference *to the supervisor.*" That obviously refers back to the language of the first step, which requires the grievance to be taken up "with the employee's supervisor." Once again, if the grievance does not involve an employee, there is no employee's supervisor, and the second step detailed in the collective bargaining makes no sense.

In the third step, grievances that cannot be settled by reference to the employee's supervisor or the Chief are referred to the employee's personnel director, who is required

to make a recommendation to the City Commissioner-in-charge. The fourth step then provides that grievances that cannot be settled by reference to the employee's supervisor, the Chief, the personnel director, or the Commissioner-in-charge may be submitted to arbitration.

Thus, the collective bargaining agreement does not vaguely refer to the arbitrability of disputes generally. It spells out a detailed grievance process, in four clearly enumerated steps. Only if the first three steps fail may a dispute be submitted to arbitration. The first step applies only to employee grievances that have been referred to "the employee's supervisor." Only if the employee grievance cannot be resolved by reference to the employee's supervisor is it subject to arbitration. That requirement is plainly stated in the agreement. It is subject to no other reasonable construction.

In reaching a contrary conclusion, the majority does not suggest that the requirement of submitting a grievance to an employee's supervisor is capable of any other reasonable construction. The majority simply holds that the requirement must be ignored, because it is inconsistent with other language in the agreement that the majority believes more generally provides for the arbitration of any disputes, whether or not they involve employees. I intend to examine the majority's reasoning in detail, so I begin by quoting it in full:

> "Read as a whole, Article 14 provides for a *generally applicable* grievance procedure, which has arbitration as its final level of dispute resolution. Article 14, section 1, provides, in part:
>
>> " 'To promote better employer-employee relationships, both parties pledge their immediate cooperation to settle *any grievance or complaints* that might arise out of the application of this Agreement and the following procedure shall be the *sole procedure to be utilized* for that purpose.'
>
> "Additionally, the final paragraph of Article 14 provides that '[t]he parties agree that the grievance procedure is *the exclusive remedy* for disputes regarding *issues covered by*

*the bargaining agreement.'* " 181 Or App at 93 (emphasis in original).

Thus, the majority's first point is that Article 14 provides for a "generally applicable grievance procedure." To begin with, I cannot find the quoted language anywhere in the agreement and, frankly, I do not know what the phrase means. The agreement certainly spells out a grievance procedure. But the grievance procedure that it describes consists of four specific steps that are required to be completed in sequence. Only step 4 of that procedure involves arbitration, and that is available only if the other three steps do not avail. Those other three steps, as I have noted, apply only to employee grievances.

Next, the majority refers specifically to Article 14, section 1, and highlights the reference to the intention of the parties to settle "any grievance or complaints" that arise out of the agreement by the grievance procedure described in that agreement. According to the majority the reference to the term "any" used in reference to grievances that are arbitrable is dispositive. At the outset, I note that the majority glosses over the opening clause of the sentence: *"To promote better employer-employee relationships,"* the parties agree that any grievances may be resolved by the means of the specified grievance procedure. To me, that clause telegraphs the subject of the wording that follows, namely, disputes between employer and employees. Aside from that, the majority again ignores the fact that the agreement provides that "any" grievance is to be resolved not by a "generally applicable grievance procedure," as the majority suggests, 181 Or App at 93, but by *"the following procedure."* What is "the following procedure"? The agreement spells that out in the immediately succeeding paragraphs, which detail the four steps that I have described above and which plainly provide that they apply only to employee grievances.

Next, the majority relies on the final paragraph of Article 14, which it reads to require generally arbitration of "issues covered by the bargaining agreement." What the agreement actually says, however, is that *"the grievance procedure"* that is described in the agreement is the exclusive

remedy for disputes regarding issues covered by the agreement. Again, "the grievance procedure" requires referring the dispute to an employee's supervisor.

In short, the majority's reasoning amounts to nothing more than question begging; it simply assumes away the very matter that is in issue, namely, what the agreement means when it says that disputes are resolved not by a "generally applicable procedure," but rather by a specific "grievance procedure." I maintain that, by referring to the resolution of disputes by means of a specific "grievance procedure," the agreement clearly requires, as the first step in that procedure, that the disputes be referred to the grieved employee's supervisor, which can only occur if there is a dispute involving an employee. The majority offers no other construction of that language. The majority simply ignores it.

The majority contends that, at best, we are confronted with conflicting interpretations that render the collective bargaining agreement "ambiguous." 181 Or App at 94. As I have noted, however, the case law makes clear that simply saying a contract is ambiguous does not make it so. In particular, simply saying that a contract contains conflicting provisions does not make it ambiguous. It first must be established that the agreement *cannot* be read in a manner that resolves the supposed conflict. *LaPointe's, Inc.*, 73 Or App at 778; *Far West Reforesters, Inc.*, 61 Or App at 143.

In this case, the agreement is perfectly capable of being read without any conflict among its provisions. As I have noted, when the agreement says that "the grievance procedure is the exclusive remedy for disputes regarding issues covered by the bargaining agreement," it reasonably may be taken to mean exactly that. In other words, "grievance procedure" is the one spelled out in the agreement, and "issues covered by the bargaining agreement" are issues raised by an aggrieved employee. No violence is done to any provision. We are required to ignore nothing.

Certainly, "issues covered by the bargaining agreement," viewed in isolation, could be read to mean *any* issues, whether they involve employees or not. But we are not permitted to manufacture conflicts in contractual language by construing terms in isolation. We are enjoined to construe

them *in context*, giving meaning to all terms, if possible. *Yogman*, 325 Or at 363. In this case, the phrase "issues covered by the bargaining agreement" is part of a complete sentence, consideration of which makes its meaning clear: "The parties agree that the grievance procedure is the exclusive remedy for disputes regarding issues covered by the bargaining agreement." Because "the grievance procedure" clearly refers only to employee grievances, it is apparent that "issues covered by the bargaining agreement" refers to issues that can be resolved by "the grievance procedure." And, because "the grievance procedure" applies only to employee grievances, it follows that "issues covered by the bargaining agreement" likewise refers to issues that are subject to that procedure, that is, issues involving aggrieved employees.

Similarly, the collective bargaining agreement provides that "any grievance or complaints that might arise out of the application of this Agreement" must be resolved by "the following procedure," namely the four-step procedure that it then sets forth. Certainly, in the abstract, "any grievance or complaints" could refer literally to *any* grievance or complaint, whether or not it involves an aggrieved employee. But, once again, the word may not be taken out of context to manufacture a conflict. We must construe it in context, giving meaning to all terms, if possible.

In this case, the beginning of the sentence in which the "any grievance or complaints" wording occurs states that its subject is the promotion of "employer-employee relationships." The reference to "any grievance or complaints" cannot be read without keeping that stated purpose in mind. In addition, "any grievance or complaints" *must* be resolved by "the following procedure," referring to the four-step process that follows. Because that four-step process applies only to employee grievances, the "any grievance or complaints" wording must be construed in that context; it apparently refers to any grievance or complaints that are capable of resolution by "the following procedure," that is, any grievance or complaints initiated by an aggrieved employee.

The majority ignores the fact that it is possible to construe all of the relevant provisions in a way that gives meaning to all. According to the majority, the agreement

must be read to require arbitration of any disputes concerning the application of the terms of the collective bargaining agreement, whether or not the dispute involves an employee. That raises a number of interesting questions.

*Query # 1*:   Where is a nonemployee grievance to be filed? The majority does not say. According to the agreement, the first step is to file with the employee's supervisor. But if there is no employee, there is no employee's supervisor with whom to file the grievance.

*Query # 2*:   If the nonemployee grievance need not be filed with the employee's supervisor, is there a second step to the grievance process, and, if there is, precisely *when* is it triggered? According to the agreement, the second step is to file with the Chief within ten days of reference to the employee's supervisor. If there is no reference to the employee's supervisor, how is the timing of the second step calculated?

*Query # 3*:   Are all three preliminary steps detailed in the agreement simply to be ignored? That is, are all nonemployee grievances directly arbitrable, without any preliminaries? If so, what of the language in the agreement that "the grievance procedure"—the four-step process that applies only to employee grievances—"*is the exclusive remedy*" for "any" disputes arising under the agreement? The majority's construction of the collective bargaining agreement clearly is untenable.

The majority alternatively complains that, if the Association cannot arbitrate this dispute, "there would be no remedy" for violations of the city's obligations under the agreement regarding retiree benefits. 181 Or App at 93. The majority's resort to *argumentum ad terrorum* simply will not bear scrutiny, however. The only issue in this case is whether a particular remedy—arbitration—is available to the Association to resolve this particular dispute. The fact that the agreement does not provide for arbitration does not mean that there is no remedy at all.

To sum up: The agreement contains no conflicting provisions, no ambiguities regarding the arbitrability of this dispute. It provides that arbitration is available only when

employee grievances cannot be resolved by other dispute resolution procedures detailed in the agreement. This case did not satisfy the prerequisites for arbitration clearly described in the agreement. It is therefore not subject to arbitration. The majority errs in concluding otherwise.

Edmonds, Linder, and Kistler, JJ., join in this dissent.