Argued and submitted May 20, 2004, reversed and remanded October 26, 2005

ALPINE MOUNTAIN HOMES, INC.,
an Oregon corporation,
*Respondent,*

*v.*

BEAR CREEK HOMES, INC.,
an Oregon corporation;
Lonny Lee and Kim Lee,
*Appellants.*

01-3072-L-3; A121618

122 P3d 111

W. V. Deatherage argued the cause for appellants. With him on the brief was Frohnmayer, Deatherage, Pratt, Jamieson, Clarke & Moore, P.C.

Walter L. Cauble argued the cause for respondent. With him on the brief was Schultz, Salisbury, Cauble & Dole.

Before Haselton, Presiding Judge, and Ortega and Rosenblum,* Judges.

ORTEGA, J.

---

* Rosenblum, J., *vice* Leeson, J. pro tempore.

## ORTEGA, J.

Defendants appeal a summary judgment in favor of plaintiff. They contend that the trial court erred not only in awarding summary judgment to plaintiff on its breach of contract claim but also in denying defendants' cross-motion for summary judgment. Both sides contend that their interpretation of their contract is the only reasonable interpretation. However, because the contract is ambiguous, neither party was entitled to summary judgment. Accordingly, we reverse and remand.

This case arises out of the sale to plaintiff of defendants' business assets. The dispute turns on whether the sale and purchase agreement required defendants to make certain payments to a financing company that provided inventory credit first to defendants and then to plaintiff. Evidence in the summary judgment record permits the following version of the events in this case and, except where otherwise noted, we understand these facts to be undisputed.

Defendants Lonny Lee and Kim Lee operated a dealership, Bear Creek Homes, Inc. (the dealership), that sold manufactured homes made by Fleetwood Homes (Fleetwood). Defendants purchased their inventory of manufactured homes from Fleetwood and financed it through a "flooring agreement" (a commercial line of inventory credit) with Bombadier Capital, Inc. (BCI).[1] BCI holds the manufacturer's statement or certificate of origin, which shows ownership of each manufactured home, until it is fully paid off.

If inventory financed by the flooring agreement remains unsold for a certain period, usually about a year, "curtailments" start to become due. Curtailments are payments on principal, separate from the interest payments on a flooring agreement. Although it is not entirely clear from the record, it appears that curtailment payments accelerate at

---

[1] Although the record includes numerous references to flooring and documents referring to defendants' account under their flooring agreement, neither party has provided a copy of any flooring agreement.

some point. According to testimony in the record, when curtailments first accrue, they amount to only two to three percent of the principal amount, but "those curtailments grow monthly and in a short time they grow to 100% due."

With the flooring arrangement in mind, we turn to the parties' contracts with each other. In March 2001, plaintiff and defendants signed a preliminary agreement intended "to document verbal agreements made between all parties." The March agreement included a requirement that plaintiff assume responsibility for some flooring payments:

"[Plaintiff agrees] to pay for the past flooring bill of $4896.37 minus the Fleetwood flooring responsibility of $485.11 for a payment of $4411.26. This shall be wired to [BCI]. It will be reflected as part of the down payment on the purchase of [the dealership]. The next flooring payment, to be received by [BCI] on or before March 14, 2001, for $4410.02 shall be paid directly by [plaintiff]. Future flooring payments reimbursed or paid by Fleetwood shall go to flooring payments."

There is a factual dispute regarding whether defendants were closing down their business immediately before the sale. Plaintiff's general manager stated that defendants were shutting down the dealership and that plaintiff "decided to step in and cover operating expenses to keep the business afloat pending a purchase agreement." One defendant, on the other hand, stated that "[w]e were not shutting down our business since we had others who were interested in purchasing [the dealership]. One of the reasons plaintiff wanted to have [the March] agreement executed was to secure their interests while working on getting a flooring line established."

In late May, plaintiff and defendants executed a sale and purchase agreement.[2] That agreement provided that plaintiff would purchase defendants' "[a]ssets, including inventories," for $50,000. Specifically, plaintiff was required

_____

[2] Portions of the sale and purchase agreement addressed plaintiff's operation of the dealership between the March agreement and the closing date for the sale and purchase agreement. That latter agreement also noted that "[plaintiff] is currently assisting in the operation of the [dealership] and [defendants have] provided [plaintiff] access to the business and its records, assets, titles, and contracts."

to pay defendants $25,000 at closing, with the balance of the purchase price to be paid, pursuant to a promissory note, in equal monthly installments starting on July 1, 2001. Plaintiff was to pay the balance in full one year from the closing date.

Defendants agreed to sell to plaintiff, among other assets, "[a]ll inventories of supplies and merchandise owned by [defendants], together with any replacements or additions to the inventories made before the closing date, but excluding inventory disposed of in the ordinary course of [defendants'] business." Defendants further agreed to maintain inventories at normal levels.

Defendants' assets included lot models of manufactured homes that defendants had financed through their flooring agreement with BCI. Certain lot models were the subject of the following contract provision:

"SECTION 6. INVENTORY FLOORING LIABILITY; PENDING TRANSACTIONS

"Inventory-Lot Models described on Exhibit 'C' attached hereto and incorporated herein by reference, are the subject of a flooring agreement between [defendants] and [BCI]. On the closing date, [BCI] and [plaintiff] will negotiate a new flooring agreement that will refinance the same Inventory-Lot Models described on Exhibit 'C'. Any obligation owed by [defendants] to [BCI] under the current flooring agreement will be the sole responsibility of [defendants] and the Inventory-Lot Models will be transferred from [defendants] to [plaintiff], free and clear of any prior liens. [Defendants agree] to execute any documentation necessary to release any interest of [defendants] in the Inventory-Lot Models and to release such models from the existing financing agreements."

Exhibit C lists eight inventory-lot models.

The precise timing of events before and after the May closing is not entirely clear. However, the exact timing is not critical to our analysis. Pursuant to the sale and purchase agreement, plaintiff entered into relationships with BCI and Fleetwood. Shortly before the May closing, plaintiff obtained a flooring agreement with BCI. At some point, plaintiff also became a dealer of Fleetwood homes.[3]

---

[3] The record does not contain any party's dealership agreement with Fleetwood.

Subsequently, a less than fully explained accounting procedure took place between Fleetwood and BCI. In late June or early July, Fleetwood paid off defendants' outstanding account balance with BCI. Shortly thereafter, BCI paid the same amount to Fleetwood; according to BCI's account manager, that payment was "made by [BCI] to [Fleetwood] on behalf of [plaintiff] for the purchase of inventory listed on the referenced invoices."[4] Because of Fleetwood's payment on defendants' account, BCI indicated that defendants had "a zero balance on their account" with BCI. The "zero balance" on defendants' account was necessary to enable plaintiff to refinance the lot models with BCI.

Meanwhile, between June and August, Fleetwood "reinvoiced" plaintiff for the purchase price of certain lot models. The invoices from Fleetwood to plaintiff were for amounts identical to or less than the prices in the original invoices to defendants, which we understand to be the purchase price that defendants were charged. The prices reflected in Fleetwood's invoices to plaintiff were not reduced by the amount of the curtailments (that is, payments on principal) due from defendants at the time the parties closed their sale and purchase agreement.

The curtailments owing on defendants' account had grown substantially between January and May of 2001. In January, curtailments of three percent were due on two of the eight models listed in the sale and purchase agreement. In March, when the parties entered into their preliminary agreement, curtailments on the models in dispute totaled $9,873.25. The curtailments in May, which were owing on five of the eight inventory lot models, totaled $77,979.19. Those curtailments constituted 100 percent of the principal due on two models, four percent on the third, two percent on the fourth, and six percent on the fifth.

---

[4] Complicating matters, it is not clear which are the "referenced invoices," as the exhibits mentioned by BCI's account manager as "showing the payment" from BCI to Fleetwood listed four invoices, only one of which appears to correspond to a lot model and "gross relieved" amount at issue in this case.

The parties disagree about whether the reinvoicing and treatment of the curtailments were handled in accordance with the sale and purchase agreement. Plaintiff's general manager stated that he did not realize until after the parties entered into that agreement that defendants had not paid the curtailments. He further stated that, before the parties entered into the agreement, he talked with the two individual defendants about statements from BCI listing the curtailments due from defendants and was told that "plaintiff would not have to worry about paying those to [BCI] because defendants had worked it out with [BCI]." Defendants, on the other hand, apparently understood that arranging for Fleetwood to pay BCI, allowing plaintiff to refinance, would mean that the curtailments were "worked out." According to defendants' affidavit testimony, curtailments typically did not become due until a year after the invoice date; the dates on the invoices from Fleetwood to plaintiff are the dates on which BCI would base curtailments on plaintiff's account, apparently meaning that plaintiff would begin owing curtailments of two to three percent one year after the "reinvoices." Additionally, one of the defendants stated that the payment by Fleetwood to BCI was made "pursuant to the understanding of the parties"; it appears from defendant's testimony that the parties contemplated that plaintiff would repurchase the inventory models at the same purchase price that Fleetwood had charged defendants, but would not incur any other obligations related to those models.

In July and August, pursuant to the promissory note, plaintiff made the first two installment payments for the purchase of defendants' business assets. In September, however, plaintiff stopped making payments because, it asserted, defendants had materially breached the sale and purchase agreement by failing to pay the curtailments. After plaintiff stopped its payments, defendants notified plaintiff that they were accelerating the balance due on the note.

Then, in October, plaintiff brought this action against defendants for breach of contract. Specifically, plaintiff contended that defendants had breached section 6 of the sale and purchase agreement by failing to pay curtailments

due to BCI in May 2001.[5] Denying that they were obligated to pay the curtailments, defendants counterclaimed for the unpaid principal owing on the sale and purchase agreement. In cross-motions for summary judgment, plaintiff and defendants offered competing interpretations of section 6 of that agreement. Plaintiff contended that section 6 unambiguously required defendants to pay the curtailments due. Defendants argued that section 6 unambiguously required them only to ensure that their obligation to BCI was discharged, thereby allowing plaintiff to refinance. The trial court granted plaintiff's summary judgment motion and denied defendants' motion.

■■    On appeal, defendants contend that summary judgment for plaintiff was erroneous and that, instead, they were entitled to summary judgment. A party is entitled to summary judgment if it demonstrates that there are no genuine issues of material fact and that the party is entitled to judgment as a matter of law. ORCP 47 C. In resolving those issues on appeal, we review the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the party opposing the motion. *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997).

■■    In construing a contract, we apply the test set out in *Yogman v. Parrott*, 325 Or 358, 937 P2d 1019 (1997). First, we examine the text of the disputed provision in the context of the document as a whole. *Id.* at 361. If the meaning of the provision is clear, we construe the terms as a matter of law. *Id.* If the language of the contract is ambiguous, then the intent of the contracting parties presents a question for a trier of fact to decide. *Id.* at 361, 363-64. Generally, when the terms of a contract are ambiguous, summary judgment regarding their meaning is precluded. *Brown v. American Property Management*, 167 Or App 53, 61, 1 P3d 1051, *rev*

---

[5] Plaintiff originally sought $108,549.04, the total curtailments due on all models in May 2001. It subsequently sought $77,989.19, which apparently reflects the $108.549.04 figure, less the curtailment on a model that was not listed in the sale and purchase agreement. Later, plaintiff sought $74,904.55, the curtailments due in June. Plaintiff states that, due to a clerical error, the trial court judgment was entered in the amount of $74.909.55, less offsets, instead of $74,904.55, the amount that plaintiff ultimately sought, less offsets.

*withdrawn,* 331 Or 334 (2000). Whether a contract is ambiguous is a question of law. *Yogman,* 325 Or at 361. If a contract's provisions are mutually inconsistent regarding a subject, the contract is ambiguous as to that subject. *Portland Fire Fighters' Assn. v. City of Portland,* 181 Or App 85, 91, 45 P3d 162, *rev den,* 334 Or 491 (2002).

We begin, then, with the text of the sale and purchase agreement, and, because the parties' dispute centers on the construction of section 6 of that agreement, we examine the text of that section. As noted above, section 6 provides, in part:

> "On the closing date, [BCI] and [plaintiff] will negotiate a new flooring agreement that will *refinance the same Inventory-Lot Models* described on Exhibit 'C'. *Any obligation owed by [defendants] to [BCI] under the current flooring agreement will be the sole responsibility of [defendants] and the Inventory-Lot Models will be transferred from [defendants] to [plaintiff], free and clear of any prior liens.* [Defendants agree] to execute any documentation necessary to release any interest of [defendants] in the Inventory-Lot Models and to release such models from the existing financing agreements."

(Emphasis added.) Although section 6 does not use the word "curtailment," the parties' disagreement focuses on whether section 6 obligated defendants to pay curtailments—that is, to make payments on principal that had come due at the time of closing.

Because the ordinary meaning of words used in section 6 creates mutually inconsistent duties, the contract is ambiguous regarding the treatment of the curtailments.[6] *See Portland Fire Fighters' Assn.,* 181 Or App at 91. The difficulty in construing section 6 is in reconciling defendants' responsibility for "any obligation" owed under their flooring agreement with BCI with plaintiff's obligation to "refinance the same Inventory-Lot models described on Exhibit 'C'."

---

[6] We have recognized some tension in the case law regarding whether extrinsic evidence may be considered at the first stage of analysis to determine if an ambiguity exists. *See, e.g., Portland Fire Fighters' Assn.,* 181 Or App at 94 n 6. Here, however, the text of the contract is ambiguous on its face, and, as we discuss, the extrinsic evidence does not resolve the ambiguity. Accordingly, this case presents no occasion for resolving the tension in the case law.

"Refinance" is not defined in the sale and purchase agreement. In ordinary usage, however, "refinance" means "to renew or reorganize the financing of : provide capital for afresh : provide for (an outstanding indebtedness) by making another loan or a larger loan on fresh terms." *Webster's Third New Int'l Dictionary* 1908 (unabridged ed 2002). The "refinance" language in section 6 thus suggests that the parties anticipated that plaintiff would assume financing obligations for the inventory-lot models listed in the agreement; to the extent that the models were paid off (as two of them would have been had the curtailments been paid), there would be nothing left for plaintiff to refinance as to those models.

However, taken literally, the "any obligation" language in section 6 suggests that defendants did indeed have to pay the curtailments that had come due, including paying off the entire principal on two of the inventory-lot models. One of the *Webster's* definitions of "obligation" is "a formal and binding agreement or acknowledgment of a liability to pay a specified sum or do a specified thing." *Id.* at 1556. Accordingly, the common meaning would suggest that "any obligation" means *any* outstanding debt owed to BCI: principal, interest, and any other amount owing.

The parties offer different interpretations to reconcile the "refinance" language with the "any obligation" language. Perhaps because of the risk of rendering the "refinance" language meaningless, no party argues that "any obligation" includes all of defendants' outstanding debt on *all* models. Rather, plaintiff contends that defendants were obligated to pay all curtailments, even though the curtailments were equal to all of the principal owing on two of the models. Defendants, on the other hand, contend that being responsible for their obligations meant arranging for the release of BCI's liens, thus eliminating defendants' obligations, and that plaintiff's obligations for the original invoice prices arose as a result of refinancing under its own flooring agreement with BCI.

The question, then, is what was plaintiff required to refinance and what was defendants' responsibility? Although the parties offer competing interpretations of section 6 to

eliminate the inconsistency, the plain language of the agreement does not support one interpretation over the other. Because the agreement is ambiguous, an examination of extrinsic evidence is necessary. *Yogman*, 325 Or at 363.

However, rather than resolve the ambiguity, the extrinsic evidence presents genuine issues of material fact. The parties offered inconsistent testimony about the business viability of the dealership before they entered into the March agreement, and, although that agreement provided for plaintiff to make payments on defendants' "past flooring bill," it is unclear what exactly the parties meant by that term or how, if at all, that agreement may have affected their understanding of the sale and purchase agreement. Furthermore, the record contains evidence that the parties discussed payments for curtailments, and, depending on whether that evidence is viewed in the light most favorable to plaintiff or to defendants, competing inferences could be drawn about their agreement.

Because the agreement is ambiguous and there are genuine issues of fact regarding extrinsic evidence needed to resolve the ambiguity, the trial court erred in granting summary judgment to plaintiff, though it did not err in denying defendants' motion for summary judgment.

Reversed and remanded.