Argued and submitted October 20, 2011, affirmed February 8, 2012

PORTLAND POLICE ASSOCIATION,
*Respondent,*

*v.*

CITY OF PORTLAND,
*Petitioner.*

Employment Relations Board
UP0508; A146751

273 P3d 192

Harry Auerbach, Chief Deputy City Attorney, argued the cause for petitioner. With him on the briefs was Lory Kraut, Deputy City Attorney, Office of City Attorney.

Anil S. Karia argued the cause for respondent. With him on the brief was Tedesco Law Group.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

HADLOCK, J.

## HADLOCK, J.

Petitioner City of Portland seeks judicial review of an order of the Employment Relations Board (ERB). In that order, ERB held that the city committed an unfair labor practice by refusing to arbitrate grievances that the Portland Police Association (PPA) filed after the board of the city's Fire and Police Disability and Retirement Fund (FPD&R Fund) changed the way in which certain pension benefits are calculated. The PPA asserted, and ERB agreed, that the pension benefit changes fell within the scope of the arbitration clause included in the pertinent collective bargaining agreement (CBA). We, too, conclude that the pension benefit dispute was subject to arbitration. Accordingly, we affirm.

The city does not challenge ERB's factual findings, and the historical facts are not in dispute. The city has had a pension fund for police and fire employees for many years. In 2006, following public criticism of the FPD&R Fund and its board, the city established a reform committee to review the fund and propose changes. In response to the committee's recommendations, the Portland City Council proposed a ballot measure that, among other things, would restructure the FPD&R Fund's board and require new employees to become members of PERS.[1] The voters approved the ballot measure in the November 2006 general election, and a new board was seated on January 1, 2007. The city's sworn police and fire employees now get retirement benefits either through the FPD&R Fund or through PERS, depending on when they were sworn. Portland City Charter § 5-101.

Chapter 5 of the city charter governs the operation of the FPD&R Fund and its board. The charter provides that the board does not make individual benefits decisions; rather, it has the generally applicable power "to prescribe rules and regulations for administration" of chapter 5 and to enforce those rules. Portland City Charter § 5-202. Chapter 5's rules include provisions governing how retirement benefits are calculated for individuals who are covered by the FPD&R Fund. Portland City Charter § 5-301. Those benefits are calculated based in part on the covered employee's "final

---

[1] "PERS" is an acronym for the Public Employees Retirement System.

pay," which is defined as "the highest Base Pay received by the * * * Member during any of the three consecutive 12-month periods preceding the month in which the * * * Member retires, dies, or otherwise terminates employment with the Bureau of Fire or Police." *Id.* § 5-303(b). That three-year period sometimes is referred to as a "lookback" period.

As ERB explained in its order, the current dispute arose after the new FPD&R Fund board determined that the fund's administrator had been using an incorrect lookback period to calculate retired employees' benefits:

> "The City Charter specifies that the lookback period ends in the month *preceding* an employee's retirement date; the Fund Administrator instead used the *actual* month the employee retired. As a result, any salary increase in the final month of work was typically included in the pension calculations."

(Emphasis in original.) The board ordered the fund's administrator "to end the lookback period in the month preceding the month the employee retired[,]" and, in May 2007, she did.

The following month, the PPA filed a grievance over the changed lookback period, alleging that the city had violated the "existing standards" clause of the CBA, which generally provides that standards of "wages, hours and working conditions which are mandatory for collective bargaining" will not be lessened during the period when the CBA is in effect, except through collective bargaining. The PPA asked that "the past practice be restored" and that all affected employees and retirees "be made whole for all lost retirement benefits, together with interest."[2] The city declined to process the PPA's grievance or to proceed to arbitration, contending that decisions by the FPD&R Fund's board are not subject to city control and are not covered by the arbitration clause in the CBA. The PPA then filed an unfair labor practice complaint against the city, alleging that the city violated ORS

---

[2] Before this court, the PPA clarifies the scope of review it seeks through its grievance, disclaiming any desire to have "an arbitrator * * * compel FPD&R to act" and stating, instead, that all it wants "is for the City to make the PPA's members whole for any harm incurred from FPD&R's pension changes."

243.672(1)(g) by refusing to arbitrate the grievance.[3] ERB ruled in the PPA's favor, and the city seeks judicial review.[4]

As framed by the parties, the question before us is whether the PPA's complaint about the changed method of calculating "final pay" is subject to the grievance procedures in the 2006-2010 CBA. That question requires us to interpret Article 3.1 of the CBA, which provides:

> "3.1 Standards of employment related to wages, hours and working conditions which are mandatory for collective bargaining except those standards modified through collective bargaining shall be maintained at not less than the level in effect at the time of the signing of this Agreement. *Any disagreement between the Association and the City with respect to this section shall be subject to the grievance procedure.*"

(Emphasis added.) The CBA's referenced "grievance procedure" includes, as a final step, arbitration.

The rules that we follow when interpreting collective bargaining agreements are well established.

> "As with other contracts, the general rule applicable to the construction of an unambiguous collective bargaining agreement is that it must be enforced according to its terms. A contract is ambiguous if it can reasonably be given more than one plausible interpretation. 'If a contract is ambiguous, the trier of fact will ascertain the intent of the parties and construe the contract consistent with' that intent. Specifically, if a term of the contract is ambiguous, the court will 'examine extrinsic evidence of the contracting parties' intent,' if such evidence is available. 'If the ambiguity persists, we resolve it by resorting to appropriate maxims of contractual construction.' In the context of a collective bargaining agreement that arguably requires arbitration, 'one

---

[3] Under ORS 243.672(1)(g), a public employer that violates "the provisions of any written contract with respect to employment relations including an agreement to arbitrate" has engaged in an unfair labor practice.

[4] The FPD&R Fund board also determined that a second aspect of the fund administrator's "final pay" calculation method was flawed, and it ordered her to change that calculation, as well. After the PPA notified the city of its intent to grieve that second issue, the parties agreed to hold all related grievance deadlines in abeyance. The details of that dispute are not important to our resolution of this case.

such maxim of construction is that any doubts about arbitrability are resolved in favor of arbitration.' "

*Arlington Ed. Assn. v. Arlington Sch. Dist. No. 3*, 196 Or App 586, 595, 103 P3d 1138 (2004) (citations omitted).

Thus, we first must decide, as a matter of law, whether Article 3.1 of the CBA unambiguously makes the parties' dispute over retirement benefit calculations "subject to the grievance procedure." It does. The city contends that the board's method of calculating retirement benefits is not a matter that falls within the scope of "wages, hours and working conditions which are mandatory for collective bargaining." PPA disagrees, arguing that "changes to pension benefits are mandatory for bargaining and, therefore, covered by Article 3.1." Thus, the parties' disagreement relates to the scope of Article 3.1—*i.e.*, whether the change in retirement benefit calculation violates the city's obligation not to lessen existing "[s]tandards of employment related to wages, hours and working conditions which are mandatory for collective bargaining." That kind of dispute is precisely what the last sentence of Article 3.1 covers by stating that *"[a]ny disagreement * * * with respect to this section* shall be subject to the grievance procedure." (Emphasis added.)

Our conclusion is bolstered by other CBA provisions that exclude certain subjects (*e.g.*, "[m]anagement rights" and "death leave") from the grievance process. Thus, the parties knew how to expressly exclude particular topics from the grievance process if they intended to do so. The absence of an analogous exclusion for retirement benefit decisions, or for decisions related to the FPD&R Fund board's actions, is telling.

Despite the plain language of Article 3.1, the city contends that the last sentence of that provision is ambiguous when read in context with Article 22 of the CBA, which describes how the grievance process works.[5] The pertinent clauses of Article 22 provide:

---

[5] As explained later in this opinion, the city seeks an ambiguity in the CBA so that it has reason to introduce extrinsic evidence of the parties' intent, which it contends confirms that the parties did not intend the grievance process to apply to disputes over retirement benefit calculations.

"22.1 To promote better employer/employee relations, both parties pledge their cooperation to settle any grievances or complaints that might arise out of the application of this Contract by use of this procedure. One purpose of the grievance procedure shall be to attempt to settle grievances at the lowest level possible.

"22.2 Step I Any officer or the Association claiming a breach of any specific provision of this Contract may refer the matter in writing *to the officer's immediate supervisor* outside the bargaining unit."

(Emphasis added.)

The city notes that, once a police or fire employee has retired and his or her FPD&R benefits are calculated, that person "no longer is an 'officer,' and does not have an 'immediate supervisor.'" According to the city, the impossibility of a retired employee referring a matter to his or her immediate supervisor renders the CBA ambiguous under our decision in *Portland Fire Fighters' Assn. v. City of Portland*, 181 Or App 85, 94, 45 P3d 162, *rev den*, 334 Or 491 (2002) (*PFFA*). In that case, we addressed whether a collective bargaining agreement between the City of Portland and the Portland Fire Fighters' Association, Local 43, authorized the firefighters' association to file a grievance on behalf of retirees. The association alleged in that grievance that the city had violated the CBA by charging retirees too much for their health care premiums. *Id.* at 88. We held that tension among several of the CBA provisions created an ambiguity regarding whether its grievance procedure was meant to apply to complaints regarding retirees' health benefits. *Id.* at 93-96. No extrinsic evidence resolved that ambiguity. *Id.* at 96. Consequently, we resorted to the maxim that doubts concerning the arbitrability of a particular issue under a collective bargaining agreement must be resolved in favor of arbitrability unless the court can say "with positive assurance" that the agreement's arbitration clause does not apply. Applying that maxim, we concluded that the retiree grievance was arbitrable. *Id.*

In this case, the city contends, just as in *PFFA*, that the union "seeks to apply the grievance procedures, including

arbitration, to its attempts to grieve decisions affecting benefits paid to retired workers." The city argues that the CBA in this case includes similar terms to those which led us to hold that the CBA in *PFFA* was ambiguous, and the city concludes that this CBA therefore must suffer the same ambiguity.

The city is correct that pertinent provisions of the CBA in this case echo those that were at issue in our earlier decision. The grievance procedures in both agreements refer generally to "employees"—not to retirees—and both require that in most circumstances an employee or the union initiate the grievance process by filing a grievance with the employee's supervisor, something that may be impossible for an employee who has retired. *See PFFA*, 181 Or App at 92-93. As we acknowledged in *PFFA*, those provisions could be read to suggest that the grievance procedure applies only to employees, not to retirees and their benefits. Conversely, both CBAs also include provisions explaining that the grievance procedures apply to "any" grievance or complaint that arises under the contracts. *See id.* at 93. The tension among those kinds of provisions created the ambiguity that led us, in *PFFA*, to consider any pertinent extrinsic evidence and then, finding none, to turn to maxims of construction. Because the grievance clause in this CBA includes similar provisions, the city contends, this CBA also is ambiguous as a matter of law.

Notwithstanding the similarities between the CBAs, we find the city's argument unpersuasive for two reasons. First, in addition to the clause in the grievance procedure stating that it applies to "any" grievance or complaint arising under the contract, like the grievance clause in *PFFA*, the contract here includes a second provision—Article 3.1— stating that "[a]ny disagreement between the Association and the City" regarding the "existing standards" clause "shall be subject to the grievance procedure." The grievance that the PPA filed in this case indisputably relates to a "disagreement between the Association and the City" over whether the existing standards clause prevents the city from changing the way in which retirement benefits are calculated. We find no ambiguity in *that* provision.

Second, to determine whether a contract is ambiguous, we analyze whether "it is susceptible to more than one

plausible interpretation," considering "the context of the contract as a whole, including the circumstances in which the agreement was made." *Cassidy v. Pavlonnis*, 227 Or App 259, 264, 205 P3d 58 (2009). The parties signed the CBA in this case in 2006, long after we issued our 2002 decision in *PFFA*. The city acknowledges—indeed, it insists—that the parties would have been aware of another published opinion when they negotiated the 2006 contract, and the PPA has not disagreed.[6] Consequently, we presume that the parties also would have been aware of the 2002 *PFFA* decision, and we view that decision as part of "the circumstances in which the agreement was made." As noted, our opinion in that case established that retirement benefit disputes are grievable under CBA terms similar to those at issue here despite the CBA's references to "employees" rather than "retirees," and despite the CBA's requirement that grievances be submitted to an employee's supervisor. Thus, after *PFFA*, the city and PPA would have understood that retirement disputes would be grievable under the 2006 CBA. In other words, the parties' presumed familiarity with *PFFA* removes the ambiguity that the references to employers and their supervisors otherwise could have created or at least establishes how the parties would have expected any ambiguity to be resolved.

Even if the CBA were ambiguous on that point, however, the city's proffered extrinsic evidence would not resolve that ambiguity in the city's favor. To the contrary, the parties' presumed awareness of our decision in *PFFA* would resolve any ambiguity in favor of arbitrability. Even if it did not, we would settle the question by looking to maxims of construction—the most pertinent being that, when a collective bargaining agreement is ambiguous with respect to whether a particular issue is arbitrable, we resolve that ambiguity in favor of arbitrability. *PFFA*, 181 Or App at 96. Thus, as ERB concluded, "every level of analysis leads to the same conclusion—the disputes are arbitrable."

Affirmed.

---

[6] As discussed below, the city contends that the parties would have been aware of a 1992 ERB decision when they negotiated the 2006 CBA, and it also argues that the parties' familiarity with the ERB decision would have informed their understanding of the CBA's meaning.